HAGENS BERMAN SOBOL SHAPIRO LLP
Robert B. Carey #011186
Donald Andrew St. John #024556
2425 East Camelback Road, Suite 650
Phoenix, Arizona 85016
Telephone: (602) 840-5900
Facsimile:  (602) 840-3012
E-Mail: rcarey@hbsslaw.com
        andy@hbsslaw.com

SALTZ MONGELUZZI BARRETT & BENDESKY, P.C.
Simon B. Paris
Patrick Howard
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 575.3986
Facsimile:  (215) 496-0999
E-mail: sparis@smbb.com
        phoward@smbb.com

Additional Counsel Listed on Signature Page

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| JODELL MARTINELLI, STEPHANIE BOOTH, MELIA PERRY, ABBIGAIL KING, NICOLE KERSANTY, and RUTH ROSS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>PETLAND, INC. and THE HUNTE CORPORATION; ABC CORPS 1-100; and JOHN DOES 1-100,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**PAGE**

I.    NATURE OF THE CASE .......................................................................................... 1

II.   JURISDICTION AND VENUE .................................................................................. 2

III.  PARTIES ................................................................................................................... 2

    A.    Plaintiffs ......................................................................................................... 2

    B.    Defendants ...................................................................................................... 5

IV.   FACTS ...................................................................................................................... 6

    A.    The Puppy Mill Industry ............................................................................... 6

    B.    The Creation of a Fraudulent Market for
          Puppy Mill Puppies ....................................................................................... 8

    C.    Petland's Unlawful Scheme Leaves a Wake of
          Consumer Complaints .................................................................................. 10

    D.    The Petland Warranty Perpetuates the Scheme
          to Defraud Consumers .................................................................................. 16

    E.    The Humane Society of the United States' Investigation
          Confirms Petland's Rampant Use of Puppy Mills ...................................... 18

V.    CLASS ACTION ALLEGATIONS ......................................................................... 18

COUNT I  VIOLATIONS OF RICO, 18 U.S.C. § 1962(c) ............................................. 21

    A.    Petland Enterprise ........................................................................................ 21

    B.    Affect on Interstate Commerce .................................................................... 22

    C.    Defendants' Association with the Enterprise ............................................... 22

    D.    Defendants Participated in the Conduct of the Enterprise ........................... 22

    E.    Pattern of Racketeering ................................................................................ 23

          1.    Formation of a scheme or artifice to defraud ................................... 23

006131-11 291824 V2

2.   Use of interstate communications in furtherance of the scheme ................................................................................... 24

3.   Defendants specifically intended to deceive Plaintiffs and the class about the origin and value of the Petland Puppies .................................................................. 24

F.   Injury to Plaintiffs and the Class ................................................................ 25

COUNT II  VIOLATIONS OF RICO, 18 U.S.C. § 1962(D) ........................................... 25

A.   Defendants Knew of and Agreed to the Petland Scheme ........................... 25

B.   Defendants furthered or facilitated the criminal endeavor of the Petland Enterprise ...................................................................................... 26

C.   Injury to Plaintiffs and the Class ................................................................ 27

COUNT III  VIOLATION OF MULTI-STATE CONSUMER PROTECTION LAWS ............................................................................ 27

COUNT IV  UNJUST ENRICHMENT .......................................................................... 30

COUNT V  VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT,  R.C. § 1345, *et seq.* ..................................................... 31

TOLLING OF STATUTE OF LIMITATIONS ................................................................. 31

PRAYER FOR RELIEF .................................................................................................. 32

JURY DEMAND ............................................................................................................ 32

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

006131-11 291824 V2

Jodell Martinelli, Stephanie Booth, Melia Perry, Abbigail King, Nicole Kersanty, and Ruth Ross (hereafter collectively referred to as "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, bring this class action seeking damages, injunctive and declaratory relief, as well as attorneys' fees and costs against Defendants, Petland, Inc.  ("Petland"), The Hunte Corporation ("Hunte"), ABC Corps. 1-100 and John Does 1-100 (collectively "Defendants"), and upon information and belief, and in connection therewith, allege as follows:

## I.    NATURE OF THE CASE

1.    This putative class action seeks to end the deceptive practices of Petland relating to the marketing and sale of puppy mill puppies across the nation, and recover monies for the thousands of consumers who were victimized by this unscrupulous conduct.

2.    Petland is a retail pet store with approximately 140 retail locations in 31 states.  Each of these retail locations is either owned by Petland or operates as a franchised business under the direction and control of Petland ("Petland franchisee").  Petland requires that each of its retail locations purchase puppies from suppliers it has approved, such as Hunte, and nearly every one is either a puppy mill or a puppy mill broker.  A "puppy mill" is "a dog breeding operation in which the health of the dogs is disregarded in order to maintain a low overhead and maximize profits."  *Avenson v. Zegart*, 577 F. Supp. 958, 960 (D. Minn. 1984).

3.    Defendants have orchestrated and executed a scheme to defraud consumers by manufacturing a fictitious market for puppy mill puppies.  This scheme is carried out by Petland who requires its approximately 140 retail locations across the country to sell these puppies to unsuspecting consumers while misrepresenting them as "the finest available" puppies from "professional and hobby breeders who have years of experience in raising quality family pets," which are "USDA approved."

4.    Petland has used its distribution capabilities to create a demand for puppy mill puppies where there would otherwise be none given their well-documented health and socialization issues.  Without regard for the serious concerns about the health and

1

006131-11 291824 V2

well-being of the animals sold or forced to continually breed, Petland requires its retail locations use specifically approved puppy mills or puppy mill brokers to purchase puppies for resale to the public.

5.     This scheme to conceal the origin of these puppy mill puppies from consumers has left thousands of families in its wake suffering from emotional turmoil and significant monetary losses as they grapple with diseased and dying puppies purchased at Petland stores throughout the United States.  Plaintiffs seek to expose Defendants' fraudulent practices for what they are, violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962, and state consumer protection statutes.

## II.     JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, 18 U.S.C. § 1964(c), and because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68.  This Court also has jurisdiction under the Class Action Fairness Act of 2005 and section 28 U.S.C. § 1332, as revised, pursuant to which this Court has diversity jurisdiction because some members of the proposed class are citizens of States different than Defendant, and because the amount in controversy exceeds the sum or value of $5,000,000.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391; 18 U.S.C. § 1965(a) because many of the illegal acts giving rise to this case occurred in this District and defendant Petland conducts substantial business in the District.

## III.     PARTIES

**A.     Plaintiffs**

8.     Plaintiff, JoDell Martinelli, is a member of the Humane Society of the United States and a citizen of Arizona residing in Mesa, Arizona.  On January 18, 2005, she purchased a three month-old wolf sable Pomeranian puppy from her local Petland store and named him Patrick.  Ms. Martinelli purchased Patrick with the understanding that he was bred under safe and humane conditions by a reputable breeder with proper

006131-11 291824 V2

canine husbandry practices.  She was charged nearly $2,000.  When she purchased Patrick he seemed a little lethargic and she thought he might not be well, but Petland provided a warranty of good health.  Shortly after she brought Patrick home he began to suffer from diarrhea and vomiting, which she had treated at the veterinarian Petland required.  Sometime later Patrick began to favor his back left leg and to walk only on three legs.  At eleven-months old he was diagnosed with a luxating patella on both of his back legs.  The veterinarian found that both of Patrick's back knees were inflamed, but especially the right knee, and recommended surgery on both knees.  The Petland store in Mesa is no longer in business.  Patrick was bred at Dgara Kennels, a puppy mill, and sold to Petland through a puppy mill broker, Pine Springs Pets, Inc.  As of January 2, 2007, Pine Spring Pets, Inc.'s license under the Animal Welfare Act was revoked.

9.     Plaintiff Stephanie Booth is a citizen of Arizona residing in Flagstaff, Arizona.  Ms. Booth's daughter worked at the Flagstaff Petland store in 2007 and felt sorry for the 4-month old Bloodhound puppy, who was kept in a cage that was too small for him.  The Booth Family purchased the puppy, whom they named Tucker, in June 2007.  Ms. Booth purchased Tucker with the understanding that he was bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Tucker was diagnosed with orbital cancer and put to sleep in October 2007 at 7 months of age.  He experienced horrible separation anxiety and health issues from purchase date until death.

10.     Plaintiff Melia Perry is a citizen of Illinois residing in Urbana, Illinois.  She purchased her dog from a Petland store in Tinley Park, Illinois in July of 2008.  Ms. Perry purchased this Miniature Pinscher for $899.00 with the understanding that he was bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Ms. Perry's puppy was diagnosed with Kennel Cough after being purchased, requiring months of veterinary treatment.  Ms. Perry's puppy was bred by Devin Lamont and sold to Petland through a puppy mill broker, Conrad's Cuddly Canines LLC.

006131-11 291824 V2

11.     Plaintiff Abbigail King is a citizen of Georgia residing in Wrightsville, Georgia.  She purchased her dog, Baron Von Minchfield ("Minchy"), a 10-week old Miniature Pinscher from a Petland store in Duluth, Georgia for $800.00 on November 7, 2007.  Ms. King purchased Minchy with the understanding that he was bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices. Less than a year after his purchase, Minchy was diagnosed with Progressive Retinal Atrophy which is an inherited disorder that will ultimately lead to permanent blindness. In addition, one day after his purchase on November 8, 2007, Minchy was diagnosed with coccidia, an intestinal parasite, that can cause diarrhea and weight loss.  Ms. King has been, and will continue to, incur significant expense for Minchy's veterinary care for the duration of his life.  Minchy was bred at Wald Kennel, a puppy mill.  Wald Kennel lacks the necessary licensure from the USDA.

12.     Plaintiff Nicole Kersanty is a member of the Humane Society of the United States and a citizen of Michigan who resides in Fowlerville, Michigan.  She purchased her dog, Mainerd, a Boston Terrier, from a Petland Store in Novi, Michigan for $999.99 with the understanding that he was bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Instead, Mainerd was sold with a congenital spinal condition in which some of her vertebrae have not formed completely while others have fused together causing tissue to grow underneath along with possible nerve damage.  Mainerd is now receiving steroid treatments for her ailments and may require expensive spinal surgery.  As a result, Ms. Kersanty has incurred, and will continue to incur, significant expense for Mainerd's veterinary care.  Mainerd was bred by Rosalie Claxton of VR's Country Puppy, a Missouri puppy mill.

13.     Plaintiff Ruth Ross is a citizen of Ohio residing in Circleville, Ohio.  She purchased her dog, Sir Oscar Brassones Bache ("Oscar"), an 11-week old Old English Bulldog from a Petland store in Chillicothe, Ohio on September 17, 2007.  Ms. Ross purchased Oscar for $1,600.00 with the understanding that he was bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Less

006131-11 291824 V2

than a week after her purchase of Oscar, he became lethargic, refused to eat or drink, and suffered from a high fever. It was not until after numerous trips to the veterinarian that on November 14, 2007, Oscar's health finally improved. Oscar was bred by Cindy Slaven at Rusty Spurr Kennel, a puppy mill.  Rusty Spurr Kennel lacks the necessary licensure from the USDA.

**B.     Defendants**

14.     Defendant, Petland, Inc. ("Petland"), is an Ohio Corporation whose principal place of business is 250 Riverside St., Chillicothe, OH 45601.  Petland is in the retail pet industry and is the largest national retailer selling puppies to consumers. Petland conducts its operations through approximately 140 retail stores in the United States and 63 additional stores in foreign markets.  Each of these retail stores is operated by Petland or its franchisee.  The global operations of Petland are conducted from its offices in Chillicothe, Ohio.  The puppies sold by Petland to class members were whelped at a puppy mill.

15.     Defendant, The Hunte Corporation ("Hunte"), maintains its principal place of business at 121 N. Royhill Boulevard, Goodman, Missouri.  Hunte is the world's leading distributor of puppies to pet stores, and is an approved Petland supplier.  Hunte maintains a "Petland Service Team" to assist in puppy sales to Petland locations across the country.  The puppies sold by Hunte to Petland for sale to class members were whelped at puppy mills.

16.     Defendants, ABC Corps. 1-100, are corporate entities within the United States who are approved suppliers of puppies to Petland.

17.     Defendants, John Does 1-100, are non-corporate entities within the United States who are approved suppliers of puppies to Petland.

006131-11 291824 V2

## IV.    FACTS

**A.    The Puppy Mill Industry**

18.    A puppy mill is generally defined as: "a dog breeding operation in which the health of the dogs is disregarded in order to maintain a low overhead and maximize profits." *Avenson v  Zegart*, 577 F. Supp. 958, 960 (D. Minn. 1984).

19.    Puppy mills are, in part, the unfortunate result of an exploited economic recovery concept implemented in the late 1940s to assist rural Midwestern farmers who were suffering widespread crop failures.  These were among the first commercial puppy breeding kennels.

20.    The market for these mass-produced puppies was created at that time through major department store chains like Sears, Roebuck & Co. and Montgomery Ward who began selling puppies during the 1950s.

21.    From this market, large scale specialty retail pet stores were born, including Petland.

22.    These puppy breeding operations soon morphed into an assembly line manufacturing process where commercial breeders sought to maximize profits by producing the largest possible quantity of puppies without regard for the health and welfare of the breeder dogs or their puppies.

23.    To operate this puppy production line, female dogs are bred at every opportunity without sufficient recovery time between litters.  Once these breeding females are physically depleted to the point they lose the ability to reproduce, they are generally destroyed using inhumane methods.  Thus, following a cruel life of breeding litters upon litters of puppies, the sire and dam of that puppy mill puppy is highly unlikely to ever make it out of the mill alive.

24.    While alive and forced to reproduce, the breeding female and her puppies are confined to a wire cage barely large enough to turn around in, sometimes exposed to the elements, twenty-four hours a day, seven days a week and three hundred sixty-five days a year.  These cages are frequently stacked upon one another in columns to conserve

006131-11 291824 V2

space so the puppy mill can maximize its number of breeding females, and therefore, its production of puppies. These cages in which the breeding female spends her entire life, and the puppies' first several weeks of life, are floored with wire mesh to facilitate waste removal and cleanup without regard for the health and wellbeing of either the puppies or their mother.

25.     The conditions at these puppy mills have degenerated to a point of disregard for the welfare of the dogs leaving them in unsanitary, overcrowded conditions without adequate veterinary care, food, water, exercise or mental stimulation and socialization.

26.     As a result of these conditions and a disregard for proper canine husbandry practices, puppies whelped at puppy mills are highly prone to debilitating and life threatening conditions, such as:

| Congenital and Hereditary Conditions | Diseases and Infirmities |
|---|---|
| Epilepsy | Giardia |
| Heart Disease | Parvovirus |
| Kidney Disease | Distemper |
| Musculoskeletal Disorders | Upper Respiratory Infections |
| Endocrine Disorders | Kennel Cough / Pneumonia |
| Blood Disorders | Heartworm |
| Deafness | Mange |
| Eye Problems | Intestinal Parasites / Chronic Diarrhea |
| Respiratory Disorders | Fleas / Ticks |
| Mental Instability | Oral/Dental Problems |

27.     These puppy mill puppies are used to stock Petland retail stores throughout the United States.

28.     There is a stigma associated with puppy mills because of their factory-style operation and irresponsible breeding, where profit is given priority over the health and

006131-11 291824 V2

welfare of the dogs being bred and sold.  This stigma eliminates the demand for puppy

mill puppies and likewise, Petland's ability to charge exorbitant prices for those puppies.

**B.      The Creation of a Fraudulent Market for Puppy Mill Puppies**

29.     Because of the increasing awareness of puppy mills, including the

inhumane treatment of the breeding dogs and problems associated with the puppies bred

there, the demand for puppy mill puppies has virtually been eliminated.

30.     To manufacture a demand for these puppies, Defendants conceal their place

of origin.  By misrepresenting that all of the puppies offered by Petland come from

"USDA approved" breeders or "professional and hobby breeders who have years of

experience in raising quality family pets," Defendants hide the true source of their

puppies – the puppy mills that consumers would otherwise avoid.

31.     Each of the approximately 140 Petland retail locations throughout the

United States operates as either a company-owned store or a franchised business.

However, regardless of ownership, Petland controls the purchase of puppies stocked at

every Petland retail store.

32.     The company-owned Petland retail stores are operated and controlled by

Petland.

33.     The Petland franchisees operate pursuant to a Franchise Agreement

between Petland (Franchisor) and an investor who serves as the Petland franchisee.  The

Franchise Agreement mandates as follow:

> Authorized Services and Products.  Franchisee agrees that
> during the term of this Agreement it shall carry only those
> products and pets and offer those services which Franchisor
> has approved or which are purchased from suppliers approved
> by Franchisor.  In furtherance and not in limitation of the
> foregoing, Franchisee agrees and acknowledges that it will
> not acquire puppies from unapproved brokers and/or breeders
> as identified by Franchisor, such as listing to be modified by
> Franchisor at its sole discretion.

34.     The Franchise Agreement further identifies the control over "Approved

Suppliers" that Petland has as Franchisor, stating:

006131-11 291824 V2

> Franchisee agrees to equip, supply and inventory the Franchised Business with items supplied by Franchisor and Franchisor-approved vendors.  If Franchisee desires to purchase from sources who have not previously been approved by Franchisor, Franchisee shall first secure Franchisor's written approval.

35.     Petland has manufactured a market for puppy mill puppies by including puppy mills or puppy mill brokers among its "Approved Suppliers" and falsely representing these suppliers as responsible breeders.  By preying upon its unsuspecting customers, Petland guarantees the sales of puppy mill puppies at all of its retail locations and encourages irresponsible and inhumane breeding practices by its Approved Suppliers.

36.     Petland further misleads consumers by exploiting the low standards of the many breed registry companies.  Petland deceives consumers into believing that a pet's registration or ability to be registered at one of these many registry companies reflects the quality of the puppy while further concealing its puppy mill origin.  In reality, the registration of a puppy purchased at Petland provides no indication that the puppy is of a better quality than non-registered dogs, is capable of being shown or is healthy and free from congenital or hereditary defects.

37.     Additionally, Petland relies upon lax government licensure standards and infrequent inspections to dispel consumers' justifiable concern that their puppy may be whelped in a puppy mill.  To instill a false sense of consumer confidence, Petland characterizes its "Approved Suppliers" as "USDA Approved" or as a USDA "licensed breeder," but this does not alter the fact that these breeders are indeed puppy mills.

38.     Moreover, a large number of Petland's puppy mill suppliers are not even USDA "licensed breeders."

39.     Similarly, Petland's scheme to defraud consumers operates where its "Approved Sellers" are puppy brokers who obtain puppies from puppy mills.  The brokers, including Defendant Hunte, serve as middlemen between Petland and the puppy mills.  Since the direct transaction is between Petland and the broker, rather than the

006131-11 291824 V2

puppy mill itself, Petland is able to manufacture and maintain the fiction that the puppies it procures for sale are not from puppy mills.

40.     The puppy mills and their brokers sell puppy mill puppies to Petland retail locations for enormous profit.  This scheme ultimately results in a drastically inflated price to the consumer who purchases a puppy mill puppy, where the consumer would not otherwise pay such a high price for a dog of such origin.  Additionally, by fraudulently misrepresenting the origin of the puppies Petland offers for sale, consumers are duped into indirectly supporting the deplorable puppy mill industry.

41.     Petland benefits by its association with these puppy mill operations by having a constant supply of the most popular dog breeds.  But it does so by disregarding the health and well-being of the animals involved and by perpetuating nefarious breeding practices.

42.     It is Petland's policy and practice to conceal or misrepresent the material fact that the puppies it sells are from puppy mills.  If Petland openly disclosed the heinous conditions in which its puppies were bred, the artificial demand for puppy mill puppies would dissipate and Petland would be forced out of the puppy-selling business unless and until it relinquished all connections with puppy mills or their distributors.

43.     Petland's scheme to defraud alleged herein has allowed Petland to manufacture and maintain a market for puppy mill puppies to the detriment of those consumers who purchased the puppies.

**C.     Petland's Unlawful Scheme Leaves a Wake of Consumer Complaints**

44.     Petland's sales and marketing practices as complained of herein have reached epidemic proportions throughout the United States.

45.     Petland's scheme to defraud consumers injects thousands of sickly and/or dying puppies into families' homes every year, for example:

- **Travis of Madison WV (11/22/08)** - We purchased a teacup yorkie for our daughters for Christmas.  The dog never made a sound on the 30 minute drive home so we were able to keep her hid.  Little did we know that the reason the dog was quiet was because she was sick.  We were atimate [sic] about giving her the glucose gel prescribed.  In the few days that we had her she was taken to the vet about three times.  The final time they wanted to

006131-11 291824 V2

send her to an emergency animal hospital where she could have 24-7 care.  Being unable to afford this because we gave 2800.00 for the dog, we elected to call Petland.  They told us to bring the dog in and they would care for her.  A few days later we were told she passed away.  Our children were heartbroken and they tried to blame us.  However we had documentation from the vet.  They replaced our dog with a chihuahua (which we love), but her value was only 1400.00.  We are still stuck paying the full amount for the dog we began with.

- **Nicole of Santa Fe NM (11/20/08)** - On October 18, 2008 I purchased a Bichon Frise puppy from Petland in Rio Rancho, NM, which at the time of purchase, the Petland owner's brother Peter, who is the Manager, stated that the puppy was healthy.  Within an hour of leaving Petland, the puppy was throwing up, but at that point in time, I thought the puppy was just nervous of her new surroundings.  That evening, the puppy was coughing and her lungs sounded extremely congested with fluid.  She was whimpering and had a very hard night.  The next day, the puppy continued to throw up and was coughing with an extreme amount of fluid in her lungs.  Her nose was bubbling mucus and I realized that something was terribly wrong.  I immediately contacted the emergency veterinary clinic, as it was Sunday and they stated to get the puppy over there immediately.  In route to the ER Vet Clinic, I contacted Peter, who agreed it was vital I get the puppy to the ER Vet and he apologized for the puppy being sick.

After many tests and X-rays at the ER Vet Clinic, it was discovered that the puppy was suffering from Infectious Respiratory Disease and was at high risk for pneumonia.  The Vet, reviewed the documentation that came with the puppy and noticed that mixed amongst all the paperwork, was an area that showed that only a few days earlier, the puppy had received very high doses of antibiotics and cough syrup.  At this point, not only was I dealing with a very sick puppy, but she had now infected my other older puppy.  The vet stated it was important that I take both puppies to their normal vet the next day.  October 20, 2008 at 8:55am, I contacted Petland's owner Susan and told her that the puppy they sold me was very ill and that I had spoken with the store manager, Peter about the situation.  At that time she denied that the dog could have been sick while in their possession.  I stated to her that I had just bought the puppy from them, and asked her why the manager did not inform me that the puppy had been given high doses of antibiotics and cough syrup and was ill.  Susan stated that it is common practice to give them high doses of antibiotics and cough syrup to prevent illness and denied their store did anything wrong.

Later that day, I contacted Petland's Manager, Peter to inform him that the puppy had been seen at the Emergency vet clinic and that I was on my way to her normal vet to get both dogs checked.  Once again, he apologized for the sick puppy and stated just to fax the bills over to Susan as soon as possible.  After many tests, it was found that the puppy not only had Infectious Respiratory Disease, but had Giardia.  Both of the puppies went through many awful tests and were put on many different medications to help them.  The medical bills came to about $800.  I faxed over the bills immediately to Susan Kern for reimbursement but to date have not received a dime.  Everytime I contact her, she states that she will be sending out the check in a few days and gives me excuse after excuse as to why it wasn't sent the time before.

11

I have taken off many days from work to care for the sick puppies losing time and money.  The medical bills have piled up and have put an extreme strain on our finances.  We have had to cut back on essentials for ourselves, to get the necessary medications and cover medical visits for the two puppies.  I have many physical problems and having to care for the sickly puppies both day and night, has caused physical and emotional distress on me, as for weeks, I was unable to rest.  This has been a complete nightmare.

- **Ryan of West Palm Beach FL (08/25/08)** - We bought a 9 week old male boxer puppy from Petland June 19th of this year.  He had a parasite, but was treated and sold to us with a certificate of health.  We noticed him coughing and not gaining very much weight, so we took him to the vet complaining of the cough.  We had blood tests and fecal tests run on the puppy and he was found to be anemic.  He was put on vitamins and antibiotics, the vet assumed he may have had a blood parasite, but the medicine should take care of it according to the vet.

On August 20th, our puppy began acting different.  He hid under our shed and was almost comatose.  He wouldn't eat or drink (not like Rocky) and only moved around a little bit.  We kept him warm and went to bed with him around 11pm.  At 12:15am on Thursday the 21st, he was whining and had vomited in his crate and had bloody fluid leaking from his nose and anus.  I rushed him to an emergency 24 hour vet and arrived at 12:45am.  He died in my arms at the front door.

The vet said she had never seen a puppy die in such a way, and that he had completely leaked out on her exam table in the back.  She offered to do a post death exam, but said it would cost around two thousand dollars.  I did not have that money to spend.  I only had my beautiful puppy for eight weeks.

Petland sold us a puppy knowing he had a parasite, Banfield did numerous studies and did not detect anything other anemia, which they also assumed was due to a parasite.  He had been given all of the medication that he was prescribed.  The corporate office of Petland today took our phone call and hung up on us when we wanted to place a complaint.  We found the breeder that bred our puppy in Oklahoma and the president of the Oklahoma Boxer Club said that they felt sure it was a 'puppy mill,' which PetLand guarantees it does not buy its puppies from.

I would have to say this was the most traumatic experience I have ever had with a pet.  People have to come to grips that older dogs are most likely going to pass at some point, but no one ever thinks so of a puppy, a four month old puppy.  More than anything else, I would hope that PetLand would have to endure something substantial to ensure that this will never happen again to any of their customers.  In total we spent around $1500 for the puppy itself, and around another $600 in vet bills.

- **Victoria of Skokie IL (08/17/08)** - We purchased a German Shepherd puppy 3/2/08 from Petland Niles.  We contemplated whether or not to get a rescue Shepherd but the store convinced us that we didn't want to take any chances since we didn't know where the rescue dogs come from, after all, they can turn on you at any time.

On the other hand Petland puppies are a much better choice.  The puppy had to be put to sleep 4 months and $5,000 later.  It appeared that the dog had distemper despite all of the

vaccinations he had supposedly received.  According to several experts on canine immunology it most likely lay dormant in his system from the time he was a small puppy. The dog most likely came from a puppy mill where they live in unsanitary conditions with sometimes hundreds of other dogs.  The puppy mill proprietors save money but [sic] inoculating the dogs themselves.  They are not trained to administer vaccines correctly, do not store them properly, and often just skip dogs altogether.

We had our puppies blood tested to see if he had antibodies to distemper which he should have had he been inoculated and sure enough he did not.  When we contacted the store they said sorry about your dog but without an autopsy and proof that he had a congenital problem they were not responsible at all.  When asked if they could contact the breeder to find out if there was a problem at their facility Petland stated that they worked with reputable breeders and that would not be necessary.  We specifically asked if our dog came from a puppy mill and they said NO.

After researching a little further we found out that our dog not only most likely came from a puppy mill but it appeared that he may have come from one of the worst puppy mills in Iowa.  This is consumer deception and fraud at its finest.  The public pays a very high premium for dogs in good faith that the breeder had been researched by the pet store for them.  They believe that is what they are paying for.  It is completely the opposite. Petland is one of the largest distributors of puppy mill puppies.  In fact, approximately 95% of their dogs come from puppy mills.  Sometimes you are lucky and get a healthy dog but it is best not to take a chance since they are born into very unsanitary and unhealthy environments.  Buyer be ware [sic].

We owned the puppy for 4 months.  Including purchase price, 1 month training at a boarding facility, and vet bills we have lost about $5,000.  Our 3 year daughter is broken hearted and we have no recourse with the store.

- **Maria of Cameron TX (03/12/08)** - I purchased a White Siberian Husky as a Christmas gift for my 3-year-old son.  About 4 days after I took her home, she developed an upper respiratory disease.  I thought it was something minor, and so I took her to the vet.  The puppy then started vomiting and having bloody diarrhea.  She had lost her appetite and was growing extremely weak as each day went by.  All of this led to having her hospitalized.  For almost two weeks she stayed at the vet.  I was so upset with Petland and tried calling them on many occasions to let them know what exactly was going on with our puppy.  On every occasion they seemed sympathetic until I asked for a refund-- and everything changed.

Our puppy died on February 2, 2008.  I purchased her on December 23, 2007, and the whole entire time she was in and out of the vet's.  Since the store found out that my puppy died of distemper, they have not wanted anything to do with me.  They will not answer my calls--and make up policies about emailing the manager only, rather than speaking to someone like it had been on other occasions.  I have called the store, the store's vet clinic, and the corporate office, as well.  I am getting nowhere.  It is really frustrating that no one wants to talk to me about my situation.  I have nowhere to turn, and it is making me very upset.  I have sent every document that I have as supporting evidence about my claim, and still nothing.

I have paid $700.00 in cash and financed $1,300.00 through Petland's bank.  With the late charges to the account the total is now about $1,400.00.  I also paid around $800. 00 in vet bills.  It has been a very frustrating time for me.  Petland wants me to pay the remaining balance on my account without even reviewing my claim, saying that there is nothing that they can do for me.  It is horrible to lose a pet and have to continue paying for it after it has passed.  If anyone has any suggestions as to what I can do, please contact me.

- **Jessica of Ankeny IA (02/21/08) -** My husband and I got a Siberian husky from Petland January 20th.  She seemed sick since the day we got her.  We thought it was because she was stressed, she had diarrhea.  We had called Tim the owner of Petland and he never called us back.  We took her to the vet several times because we didn't want her to get dehydrated.  He put her on some different meds.  Nothing helped.  Wednesday night (30th of January) she started to act really freaked out and crying so we thought she was in pain.  My mom and I called Petland on Thursday the 7th and spoke to a young lady that works there.  She stated that they were no long [sic] involved with Starch Pet Hospital where we were taking our new puppy too.  I was very upset to find that out while my dog is dying at their place! We took her to the vet on Thursday and she started to have many of [sic] seizures in one hour.  The vet took her home to his house overnight to watch her.  He called Friday and said he had been giving her valium for her seizures.  We put her down on Friday February 8th.  Tim said he would pay for her and he hasn't we are getting bills now and he won't return our calls.  I have already filed a complaint about Petland West Des Moines, Iowa with the Attorney General, Dept of Agriculture, Better Business Bureau and the Humane Society.  I just thought you should know how your business is being run out of Iowa!

- **Guy of Cape Coral FL (02/10/08) -** I bought an Italian Greyhound in the end of 2006.  The dog was ill the week after, throwing up and could not hold down food.  I took the dog to the Vet linked to Petland; they told me to give her medicated food, and she should be okay in a few days.  This dog was not eating or drinking, and was weak.  And this was the advice of a Vet.  After about 3 hours, the dog was whining and screaming all day.  We finally took her to our own vet, and the dog had pneumonia, and was almost dead.  We called Petland to state this, and they stated we should have revisited the vet they use, and would not pay the bill.  Now the dog has chronic issues, spinal deformity, wobble syndrome, muscle and nerve issues.

The results are this dog will have life-long medical needs beyond my ability to pay.  These dogs are supposed to be well breed, and good blood lines; this looks like a mill puppy situation.  The papers given when you buy the dogs state pure breed; the results of the dog I have purchased show this as being false.  This dog now has to be seen by a nerve and spinal DR in Sarasota to see if this is life-challenging.  They need to pay for this dog's medical, and return my money for selling me a sick dog.  This is by no means a good experience.  I love this dog, and she's family, and we'll do whatever it takes, but this company needs to be held accountable.  And I will do whatever to make sure this is known.

- **Jessica of Coal City WV (01/11/08) -** We purchased an Italian Greyhound at PetLand.  The dog itself was $1,393.88.  (That's not including all of the other stuff we had to get for her. )  We had her for 5 days altogether.  We took her on the third day for her first vet

006131-11 291824 V2

visit and found out that she had Kennel Cough.  So we got the meds for her and started her on them.  The next day when we got up she was vomiting and had bloody stool.  We called PetLand and told them about the bloody stool, and they told us that it was normal for her to have bloody stool--that it could be from stress.  But when her stool turned to nothing but runny blood, we took her to the vet.  A Parvo test was run and came back positive.  We told PetLand that we couldn't afford to keep her in the vet's, so they gave us a check and told us that if the dog made it through we would have the option to buy her back after she was well.

Well, she died tonight and we called PetLand and told them we paid in cash and we wanted cash back--not a check.  So now we are waiting to see if they will do that.  Our daughter is 2 years old, and this was her first puppy.  We were attached, also.  And now we're out a puppy and money for everything that we bought for the dog that can't be used again for another dog because she had Parvo.  I think pet stores like PetLand should be closed down.  Puppy mills are animal cruelty.  If someone like you or me did half the stuff like they do to animals, we would be locked up for life.  Why are they still in business? I just don't understand.  I will probably be leaving more messages on here when we find out more from PetLand.

- **Janice of Louisville TN (11/18/07) -** I purchased a Maltese puppy from the above Petland on 11/10/07, 1:29 PM, according to receipt.  The pup was apparently ill as it died while under the care of a veterinarian four days later.  The cost of the Maltese and supplies (foods and a medication to prevent hypoglycemia) recommended by Petland came to a total of $1,260.58.  The vet bill was nearly $300.00.  The monetary and emotional cost has been great.  When I called Ms. Adams, she expressed no concern about my loss, financial or emotional.  She assured me that there was no warranty on the dog, and expressed no intent to reimburse me for selling me a sick dog.

- **Laurel of Bradenton FL (03/12/07) -** Bought a dog, now two years old, has been diagnosed with degenerative disc disease, Vet says it's genetic.  Petland was buying pets from a rogue puppy mill called Pine Springs Pets.  $1,000's of dollars in vet bills.  Sadly, the contract with Petland only covers illness during the first year.  Very smart.  Most puppies don't show signs of genetic problems until around two years old.

- **Alison of Acworht GA (02/26/06) -** We purchased a puppy on Friday Feb 17th.  My husband had originally gone by himself to look for a puppy.  He came home and said he found a Boston Terrier/Bassett Hound Mix at Petland.  We decided to go see the puppy.  She was adorable.  We got her out and she was very playful.  We decided to put $100 deposit on her for 1 week so we could get things together for her at home.  This puppy was for my 6 year old son.  He was very excited that he named her right away "HARLEY".  We went about 4 times to see her before we got her so my son could play with her.  She was always so playful and sweet.  We finally did pick her up on Friday.

I took her straight to the vet.  She had a fecal done and I was told she had worms.  She was given meds for the worms and I told that she might get sick.  That night she played for a while then she started to get very sick.  She got sick all over our house.  She wouldn't move.  The next morning I called the vet.  We took her in.  She ended up having Parvo.  She was half dead.  She had to be put on fluids right away.  I called Petland and told the manager that we had just gotten her yesterday and that she had Parvo.  I told him

006131-11 291824 V2

that all the other puppies were probably infected too.  Because we did notice that everytime we went to see her she was in a different cage.  Parvo is a very serious, contagious illness for puppies.

The manager wanted us to bring her to him so his vet could check her out.  We told him it didn't matter what vet she saw as long as she was getting treatment and to take her off fluids to bring her to him she could die.  She stayed at our vet from Sat to Mon night.  We did bring her home Mon Feb 20th.  She didn't move all night.

We took her to their vet Towne and Country on Tues.  She has been there for 6 days so far.  She is still there.  I called 2 times on Tues to see how she was doing.  Didn't get much info.  Called Wed they never called back.  So basically we need to decide what to do.  We need to talk to the vet and the manager.  I want all my vet bills paid for and I want full reimbursement for the puppy.  She was $400. 00.  I feel that this is only far after what trauma my family has been thru.  My 6 yr old son keeps asking me why we got a sick puppy and is she going to die.  He talks about her all the time.  If she doesn't get better we can't get another puppy for at least 6mos to a 1yr because of the Parvo in our house.

46.     The condition of these puppy mill puppies is not unfamiliar to Petland or its franchisees.  For instance, in anticipation of an Indiana franchisee's grand opening, the very first batch of puppies from Defendant Hunte, a Petland "Approved Seller," included 60-65 puppies, over half of which were sickly or dying with a wide range of conditions including, parvovirus, pneumonia, respiratory infections, and ringworm.

47.     An Ohio franchisee had a similar experience with puppy mill puppies from Defendant Hunte.  In the initial batch of puppies from Hunte, many were sick and/or dying, including two puppies that were sold to consumers and died of canine parvovirus within days of their sale.  Even the puppies from Hunte's initial shipment that survived soon began to display symptoms of illness requiring expensive veterinarian care.

48.     No consumer seeks to obtain, and/or pay a premium price for a puppy mill puppy, given the emotional turmoil and additional expense associated with these puppies.  And most purchasers would be appalled to learn that any portion of their purchase price was used to encourage unsafe and inhumane breeding practices.

**D.     The Petland Warranty Perpetuates the Scheme to Defraud Consumers**

49.     Consistent with Petland's overarching scheme to deceive consumers, Petland provides purchasers of its puppy mill puppies a limited warranty.  This limited

16

warranty perpetuates Petland's scheme to defraud consumers as alleged herein by further facilitating the fiction that a consumer's new puppy is not a sickly and/or dying puppy mill puppy.  The limited warranty, however, offers consumers little to no protection from this reality.

50.     The limited warranty warrants the puppy against diseases and infirmities common to these Petland puppy mill puppies, such as: Canine Parvovirus, Distemper, Hepatitis, or Canine Influenza.  This portion of the limited warranty affords the consumer little to no actual protection from these diseases and infirmities for at least two reasons: (i) the warranty is contingent upon an initial veterinarian visit with a veterinarian designated by Petland within days of purchase, but prior to the gestational period for many of these illnesses; and (ii) the coverage is limited to the purchase price of the puppy leaving the consumer to pay all expenses above and beyond that price.

51.     The limited warranty also warrants the puppy against "hereditary and congenital disorders."  This warranty offers consumers no protection against these common defects in puppy mill puppies for at least three reasons:  (i) coverage is limited by an ambiguous condition precedent in that the disorder must "interfere with the puppy's ability to lead a normal life;" (ii) unlike the other coverage terms, the time period for this coverage is triggered by the puppy's birth rather than its purchase date knowing that many of these hereditary and congenital disorders do not manifest themselves until the warranty period has expired; and (iii) the relief afforded under this limited warranty coverage is a credit toward another puppy mill puppy to start this vicious cycle all over again rather than a monetary refund.

52.     Although providing little actual protection, the Petland warranty serves to further the fiction that it is selling puppies from "professional and hobby breeders who have years of experience in raising quality family pets" that are the "the finest available," instead of puppies from some of the most notorious puppy mills in the United States.

17

**E.     The Humane Society of the United States' Investigation Confirms Petland's Rampant Use of Puppy Mills**

53.     On November 20, 2008, The Humane Society of the United States ("The HSUS") revealed the findings from an eight-month investigation into Petland and its sales and marketing practices.  The results of this investigation confirm Petland's practice of misrepresenting and concealing the origin of puppy mill puppies.

54.     In the largest ever puppy mill investigation, The HSUS visited 21 Petland retail locations, and 35 breeders and brokers who sold puppies to Petland.  The HSUS investigators also reviewed USDA reports and import records from an additional 322 breeders and about 17,000 individual puppies linked to Petland.

55.     This investigation into Petland reveals the following:

- Despite assurances by Petland that it knows its breeders and deals only with those who have "the highest standards of pet care," their puppies come from puppy mills.

- The HSUS investigators witnessed and documented the deplorable conditions at some of these puppy mills, including puppies living in filthy, barren cages reeking of urine, with inadequate care and socialization.

- Many of the Petland puppies were obtained through large scale pet distributors – brokers – who obtained the puppies from puppy mills.

- A review of USDA inspection reports from more than 100 Petland breeders revealed that more than 60% of the inspections found serious violations of basic animal care standards, including sick or dead dogs in their cages, lack of proper veterinary care, inadequate shelter from weather conditions, and dirty, unkempt cages that were too small.

56.     Thus, Petland's execution of its fraudulent scheme allows it to continue to sell puppy mill puppies to unsuspecting consumers and sell them at grossly inflated prices.

### V.     CLASS ACTION ALLEGATIONS

57.     This action is brought by Plaintiffs as a class action pursuant to Fed. R. Civ. P. 23, and for all claims asserted herein, on behalf of themselves and the following class:

> All persons who purchased a puppy from a Petland retail
> store since November 20, 2004.  Excluded from the class are

18

006131-11 291824 V2

any defendants, their respective parents, employees, subsidiaries and affiliates, and all government entities.

58.     The class is believed to include tens of thousands of consumers who purchased puppy mill puppies from Petland retail locations across the nation.

59.     The proposed class is so numerous and geographically dispersed that the individual joinder of each would be impracticable.  The exact number of members is unknown at this time but can be ascertained readily from the records of Defendants, or their agents.

60.     This matter presents common questions of law and fact arising out of the sale of the puppy mill puppies at Petland stores.  These common questions predominate over any individual questions applicable to members of the proposed class.  Among the numerous questions of law and fact common to the proposed class are:

a.     whether Defendants embarked upon a scheme to defraud consumers by concealing and/or misrepresenting that the puppies being sold at Petland retail locations were not from puppy mills;

b.     whether Defendants' sales and marketing practices and representations made in connection with puppies sold at Petland locations in the United States were unlawful under RICO and/or violated the consumer protection statutes asserted herein;

c.     whether Defendants conspired to execute the scheme to defraud consumers alleged herein; and

d.     whether Plaintiffs and members of the class suffered an injury as a result of Defendants' illegal conduct.

61.     Fed. R. Civ. P. 23(a)(3) and (4):  Typicality and Adequacy.  Plaintiffs' claims are typical of the proposed class.  Plaintiffs' puppies were purchased from Petland and whelped at a puppy mill.  The origin of Plaintiffs' puppies was intentionally misrepresented to them.  Plaintiffs and all members of the class sustained damages arising out of the Defendants' common course of conduct as complained of herein.  The amount of money at issue is such that proceeding by way of class action is the only

006131-11 291824 V2

economical and sensible manner in which to vindicate the injuries sustained by Plaintiffs and members of the class.

62.     Plaintiffs will fairly and adequately protect the interests of class members. Plaintiffs have retained qualified and experienced counsel in class action litigation, and counsel has no adverse interest.  Plaintiffs understand the nature of the claims herein, have no disqualifying interest and will vigorously represent the class.  Plaintiffs, by agreement with their counsel, have the resources necessary to prosecute the case fully and completely.

63.     Fed. R. Civ. P. 23(b)(2):  A class action is appropriate because Defendant has acted, and/or failed to act, on grounds generally applicable to the representative Plaintiffs and the class, thereby making appropriate final injunctive relief and or declaratory relief with respect to the class.

64.     Fed. R. Civ. P. 23(b)(3):  A class action is appropriate because, as set forth *supra*, the common questions of law or fact predominate over any questions affecting individual members of the class, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

65.     There are no unusual legal or factual issues which would cause management problems not normally and routinely handled in class actions.  Petland's scheme to defraud consumers across the country was a uniform course of action created and adopted at its corporate headquarters and implemented at its stores throughout the country.  Damages may be calculated with mathematical precision.

66.     Further, a class action is an appropriate method for the fair and efficient adjudication of this controversy, because there is no special interest in the members of the class controlling the prosecution of separate actions.  Absent a class action, most members of the class would likely find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law.  Absent a class action, class members will continue to suffer harm and Defendants' misconduct will proceed without remedy.  The class treatment of common questions of law or fact is also superior to multiple individual

006131-11  291824 V2

actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

## COUNT I

### VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)

67.     Plaintiffs restate and reallege, and incorporate herein by reference, the preceding paragraphs as though fully set forth herein.

68.     Section 1962(c) of RICO prohibits "any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C.  § 1962(c).

**A.     Petland Enterprise**

69.     For purposes of this claim, the RICO "Enterprise" is an association-in-fact consisting of Petland, its franchisees and approved sellers, including Defendant Hunte. Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of the Petland Enterprise ("Enterprise") through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

70.     Upon information and belief, the Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are, and have been associated for the common or shared purpose of executing the Petland scheme to defraud consumers into buying puppy mill puppies and buying them at grossly inflated prices.  Each of the participants in the Enterprise was aware of the common plan of promoting the puppies as being bred at a breeder that was not a puppy mill and each received substantial revenue from the scheme to promote and sell puppy mill puppies. The demand for the puppy mill puppies and the revenue Defendants received from the sale of such puppies was many times greater than it would have been if the puppies were disclosed as being whelped at puppy mills.

71.     The Enterprise is an ongoing organization that serves as a vehicle to carry out the Petland scheme.  Members of the Enterprise are associated through contractual relationships, financial ties, and the continuing coordination of activities between

006131-11 291824 V2

members.  Members also share a common communication network through which they share information on a regular basis.

72.     The Enterprise functions as a continuing unit.  Each of the members continues to play their respective roles in the scheme and each benefit from the activities of the other members in furtherance of the scheme.  Petland is able to market its franchise business in large part on the profitability of puppy sales.  Petland franchisees are required to purchase puppies from those sellers approved by Petland.  The approved sellers have an outlet for the sales of their inhumanely bred puppies, while Petland and its franchisees sell puppy mill puppies to an unsuspecting public at premium prices.

**B.      Affect on Interstate Commerce**

73.     The Enterprise engages in and affects interstate commerce because defendants marketed, transported and sold tens of thousands of puppies throughout the United States.

**C.      Defendants' Association with the Enterprise**

74.     At all relevant times, each of the Defendants was aware of the scheme to defraud Plaintiffs and members of the class and was a knowing and willing participant in the scheme, and reaped profits as a result of its participation.

75.     Upon information and belief, Petland devised the scheme and directed the operation of the Enterprise in carrying out the scheme to sell puppy mill puppies to customers without their knowledge and to sell them at grossly inflated prices.

76.     Upon information and belief, Hunte was aware of and participated in Petland's scheme to defraud Plaintiffs and the class.  It supplies puppy mill puppies to Petland stores and participates in the false representation that the puppies have been bred by reputable breeders who adhered to safe and humane breeding practices.

**D.      Defendants Participated in the Conduct of the Enterprise**

77.     Each defendant had some part in directing the affairs of the Enterprise.  Petland controls and manages the affairs of the Enterprise.  Through its franchise agreements Petland binds its franchisees to its authorized sellers and directs its employees

and its franchisees to pass off puppies bred in puppy mills as healthy, humanely-bred puppies and to sell them at an inflated price.

78.    Upon information and belief, Hunte distributed large numbers of puppies bred under unsafe and inhumane conditions and has falsely represented the conditions of their birth.  Hunte knowingly participated in the fraudulent scheme to pass puppy-mill dogs off as humanely-bred dogs, which in turn allowed Petland to charge inflated prices for the dogs.

**E.    Pattern of Racketeering**

79.    To carry out their fraudulent scheme each Defendant has conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  These acts have occurred for more than four years and are continuing today.  They are not isolated or sporadic acts but are part of a continuing operation to defraud consumers about the nature and value of the puppies sold at Petland stores.

80.    Defendants' racketeering activities have amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and members of the class.  Each separate use of the U.S. mails or interstate wire facilities employed by Defendants was related, had similar intended purposes, involved similar participations and methods of execution, and was conducted for the same purpose of defrauding consumers about the nature and value of Petland's puppies.

**1.    Formation of a scheme or artifice to defraud**

81.    Defendant's fraudulent scheme consisted of, *inter alia*:  deliberately misrepresenting that the puppies sold at Petland retail stores across the nation were "the finest available," and by deliberately misrepresenting puppy mills who bred the dogs as "professional and hobby breeders who have years of experience in raising quality family pets," and by deliberately misrepresenting that the puppies were from USDA-licensed breeders, thereby misrepresenting the true origin and value of the dogs sold at Petland.

23

### 2.   Use of interstate communications in furtherance of the scheme

82.   During the class period, Defendants' illegal conduct and wrongful practices were carried out by an array of agents and/or employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information and funds by the U.S. mails and interstate wire facilities.

83.   Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding acts of mail and wire fraud) have been deliberately hidden and cannot be alleged without access to the Defendants' books and records.  Indeed, an essential part of the successful operation of the scheme depended on secrecy, and the Defendants withheld details of the scheme from the Plaintiffs and members of the class.  Generally, however, Plaintiffs can describe the occasions on which the predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme.  They include thousands of communications to perpetuate and maintain the scheme throughout the class period, including, *inter alia*:  (i) marketing materials and advertisements about the franchise opportunities of Petland across the country; (ii) the exchange of operational information and financial statements between each Petland franchisee and Petland in Ohio; (iii) communications, including financial payments, between Petland, its franchisees and the puppy mills or puppy brokers who have been, or seek to be, approved by Petland to sell puppies at Petland and to Petland franchisees; and (iv) receiving the proceeds of the improper scheme.

84.   These uses of the U.S. mail or interstate wire facilities are closely related to the fraudulent scheme because they facilitated the fraudulent sale of puppy mill puppies to Plaintiffs and the class.

### 3.   Defendants specifically intended to deceive Plaintiffs and the class about the origin and value of the Petland Puppies

85.   Upon information and belief, the scheme was devised and intentionally crafted to ensure that Plaintiffs and members of the class would unknowingly purchase puppies bred under unsafe and inhumane conditions and pay inflated prices to Petland and Petland-supported puppy mill operations.

24

006131-11 291824 V2

86.     By intentionally and fraudulently misrepresenting the true origin of the puppies and the conditions under which they were bred, Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

**F.     Injury to Plaintiffs and the Class**

87.     Plaintiffs and members of the class have been injured in their property by reason of these violations in that collectively they have paid millions of dollars into this fraudulent market that they would not have paid had Defendants not engaged in their pattern of racketeering activity.  As a direct result of Defendants' fraudulent scheme Plaintiffs and the class unwittingly purchased puppy mill dogs and paid a premium price for them.  Additionally, Plaintiffs and class members incurred consequential costs, including veterinarian bills arising from medical conditions commonly associated with puppy mill breeding conditions.

88.     Under Section 1964(c) of RICO, Defendants are liable to Plaintiffs and members of the class for three times the damages that Plaintiffs and the class have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**COUNT II**

**VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)**

89.     Plaintiffs restate and reallege, and incorporate herein by reference, the preceding paragraphs as though fully set forth herein.

90.     Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

91.     Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).  The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Petland Enterprise through a pattern of racketeering activity, as previously described.

**A.     Defendants Knew of and Agreed to the Petland Scheme**

92.     Upon information and belief, Defendants each knowingly agreed to facilitate a scheme, which includes the operation or management of the previously

25

described Petland Enterprise in furtherance of its goal of defrauding Plaintiffs and the class by making false representations about the origin and value of Petland's puppy mill dogs.

93.     That Petland was aware of the essential nature and scope of the Enterprise and intended to participate in it can be inferred *inter alia*: by its selection of puppy mills or puppy mill brokers, such as Defendant Hunte, as its supplier of dogs; its misrepresentations of the origin and quality of its dogs; its oversight of its franchisees' representations and sales of Petland dogs; and from the fact that the bulk of the emails, faxes, and phone calls that are at issue in this lawsuit are believed to have originated from Petland's headquarters.

94.     Hunte's knowledge of the nature and scope of the Enterprise and agreement to participate in it can be inferred from its distribution of puppies bred under inhumane and unsafe conditions and its willingness to allow false representations about the value of the dogs it provided to Petland and the conditions under which they were raised.

**B.      Defendants furthered or facilitated the criminal endeavor of the Petland Enterprise**

95.     Defendants each took steps to further or facilitate the criminal endeavor of the Petland Enterprise by agreeing to commit or participating in the Enterprise's previously described pattern of racketeering activity.

96.     Petland facilitated or furthered the criminal endeavor of the Petland Enterprise *inter alia*: by creating and ratifying the scheme at its corporate headquarters; by selecting the breeders and dog suppliers to its Petland franchisees; by overseeing the franchisees and requiring them to sell dogs, which included dogs bred under unsafe and inhumane conditions; and by engaging in misrepresentations about the dogs sold at Petland and their breeders.

97.     Hunte facilitated or furthered the criminal endeavor of the Petland Enterprise *inter alia*: by distributing puppy mill puppies and by supporting Petland's false representations about the quality of the dogs Hunte provided and the conditions under which they were bred.

006131-11  291824 V2

**C.     Injury to Plaintiffs and the Class**

98.     Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs and the class of money.

99.     Plaintiffs and members of the class have been injured in their property by reason of these violations in that they have paid millions of dollars into this fraudulent market that they would not have paid had Defendants not engaged in their pattern of racketeering activity.  As a direct result of Defendants' fraudulent scheme Plaintiffs and the class unwittingly purchased puppy mill dogs and paid a premium price for them. Additionally, Plaintiffs and class members incurred consequential costs, including veterinarian bills arising from medical conditions commonly associated with puppy mill breeding conditions.

100.     Defendants are each liable for their own acts and the acts of their co-conspirators in furtherance of the scheme.  By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiffs and members of the class for three times the damages Plaintiffs and members of the class have sustained, plus the cost of this suit, including reasonable attorney's fees.

**COUNT III**

**VIOLATION OF MULTI-STATE CONSUMER PROTECTION LAWS**

101.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

102.     Plaintiffs and the members of the class are consumers that purchased puppies from Petland for personal, family, or household purposes.

103.     Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the marketing and sale of these puppies to Plaintiffs and the proposed class members.

104.     Defendants violated this duty by misrepresenting the origin, characteristics, and quality of the puppies being sold by Petland.

27

105.    Plaintiffs and members of the class were directly and proximately injured by Defendants' conduct and would not have paid for these puppy mill puppies had Defendants not engaged in its fraudulent scheme.

106.    Defendants' misrepresentations and/or material omissions to Plaintiffs and the proposed class members were and are unfair and deceptive acts and practices.

107.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiffs and the proposed class members.

108.    Plaintiffs and the class members were deceived by Defendants' misrepresentations and/or omissions.

109.    As a proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and the proposed class members have suffered an ascertainable loss and are entitled to relief, in an amount to be determined at trial.

110.    Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed below:

(a)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44 1522, *et seq.*;

(b)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, and Cal. Civ. Code § 1770, *et seq.*;

(c)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

(d)    Defendant have engaged in unfair competition or unfair or deceptive acts or practices in violation of Indiana Code Ann. § 24-5-0.5-3;

(e)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 501/1, *et seq.*;

(f)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Me. Rev. Stat. Ann. Tit. § 59205-A;

(g)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

(h)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

(i)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of  Mo. Rev. Stat. § 407.010, *et seq.*;

(j)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59 1601, *et seq.*,

(k)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(l)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358 A:1, *et seq.*,

(m)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57 12 1, *et seq.*;

(n)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(o)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75 1.1, *et seq.*;

(p)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201 1, *et seq.*;

(q)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39 5 10, *et seq.;*

(r)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47 18 101, *et seq.;*

(s)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Va. Code § 46A-6-101, *et seq.*;

006131-11 291824 V2

(t)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. Com. Code § 17.41, *et seq.*; and

(u)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*

111.   Plaintiffs and members of the class were injured by Defendants' conduct because Plaintiffs and members of the class would not have paid for, or would have paid substantially less, for puppies from Petland.  Plaintiffs and class members are entitled to damages, restitution, disgorgement, and/or such orders or judgments as may be necessary to restore to any person in interest, any money which may have been acquired by means of such unfair practices and to the relief set forth below.

## COUNT IV

## UNJUST ENRICHMENT

112.   Plaintiffs restate and reallege, and incorporate herein by reference, the preceding paragraphs as though fully set forth herein.

113.   As the intended and expected result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from their scheme to defraud purchasers of puppies from Petland.

114.   Defendants have voluntarily accepted and retained these profits and benefits, derived from Plaintiffs and members of the class, with full knowledge and awareness that, as a result of their deception, Plaintiffs and the members of class paid substantial monies and benefits to Defendants to which Defendants were not lawfully entitled.

115.   Defendants have been unjustly enriched at the expense of the Plaintiffs and the class members, who are entitled to in equity, and hereby seek, the disgorgement and restitution of Defendants' wrongful profits, wrongful commissions, revenue and benefits to the extent, and in the amount, deemed appropriate by the Court, as well as such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

006131-11 291824 V2

**COUNT V**

**VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT,
R.C. § 1345, *et seq.***

116.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

117.    Defendants are suppliers subject to and governed by Ohio Consumer Sales Practices Act ("OCSPA"), R.C. § 1345.01 *et seq.*

118.    The Plaintiffs and members of the Class are all consumers as defined by R.C. § 1345(D).

119.    The knowing acts and practices complained of herein by Plaintiffs, individually and on behalf of the Class, constitute unfair, deceptive or unconscionable sales practices in violation of R.C. § 1345 *et seq.*

120.    The acts and practices of Defendants include all aspects of the scheme to defraud consumers by manufacturing a fraudulent market for puppy mill puppies by concealing or misrepresenting that the puppies being purchased were whelped at a puppy mill.

121.    As a direct result of the deceptive practices of the Defendants, Plaintiffs and the members of Class suffered damage and seek a declaration that Defendants' conduct as alleged herein constitutes unfair, deceptive or unconscionable sales practices in violation of R.C. § 1345 *et seq.*

**TOLLING OF STATUTE OF LIMITATIONS**

122.    Plaintiffs restate and reallege, and incorporate herein by reference, the preceding paragraphs as though fully set forth herein.

123.    Petland and Hunte's conduct was and is, by its nature, self-concealing. Petland, Hunte and their co-conspirators, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and have actively foreclosed Plaintiffs and the class from learning of their illegal, unfair and/or deceptive acts.

31

124.    By reason of the foregoing, the claims of Plaintiffs and the classes and subclass are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.      An order certifying this action as a class action, appointing Plaintiffs as Class Representatives and designating Plaintiffs' counsel as Class Counsel;

B.      Defendants' scheme to defraud consumers in their purchase of Petland puppies constitutes the predicate acts for RICO of mail fraud and wire fraud;

C.      A judgment awarding Plaintiffs and each member of the class a full refund of all monies paid for their puppies, along with consequential damages resulting from Defendants fraudulent conduct, interest thereon and any amount by which Defendants have been unjustly enriched, plus treble damages, and any additional relief to which they may be entitled under state consumer protection laws as set forth in Count IV;

D.      An order awarding Plaintiffs and the class their costs of suit, including reasonable attorneys' fees and expenses as provided by law;

E.      A declaratory judgment that Defendants' conduct constitutes unfair, deceptive or unconscionable sales practices in violation of R.C. § 1345, *et seq*.; and

F.      An award of such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, or proper by the Court.

## JURY DEMAND

Plaintiffs request that all issues herein shall be tried to a jury.

006131-11 291824 V2

RESPECTFULLY SUBMITTED this 16th day of March, 2009.

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By  s/ Robert B. Carey
Robert B.  Carey
Donald Andrew St. John
2425 East Camelback Road, Suite 650
Phoenix, Arizona 85016
E-Mail:  rcarey@hbsslaw.com
E-Mail: andy@hbsslaw.com

Steve W.  Berman, WSBA #12536
Anthony Shapiro, WSBA #12824
Barbara Mahoney, WSBA #31845
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
E-mail: steve@hbsslaw.com
E-mail:  tony@hbsslaw.com
E-mail:  barbaram@hbsslaw.com

Simon Bahne Paris
Patrick Howard
**SALTZ, MONGELUZZI, BARRETT
& BENDESKY, P.  C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel (215) 575-3986
Fax (215) 575-3894
E-mail: sparis@smbb.com
E-mail: phoward@smbb.com

**Garen Meguerian**
21 Industrial Boulevard, Suite 201
Paoli, PA 19301
Tel: (610) 590-2176
Fax: (480) 247-5804
E-mail: gm@garenmlaw.com

*Attorneys for Plaintiffs*

33

006131-11 291824 V2

**<u>Of Counsel</u>:**

Kimberly Ockene
Aaron D. Green
The Humane Society of the United States
2100 L Street, NW
Washington, DC  20037
E-mail: kochene@hsus.org
E-mail: agreen@hsus.org