**Hagens Berman Sobol Shapiro LLP**
Robert B. Carey #011186
Donald Andrew St. John #024556
2425 East Camelback Road, Suite 650
Phoenix, Arizona 85016
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
E-Mail: rcarey@hbsslaw.com
        andy@hbsslaw.com

*Attorneys for Plaintiffs and the Putative Class*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| JODELL MARTINELLI, STEPHANIE BOOTH, MELIA PERRY, ABBIGAIL KING, NICOLE KERSANTY, and RUTH ROSS, CHERYL HUSTON, ALLAN HUSTON, GIANNA SCAPPUCCI, JANIE GRIFFIN, ELLIOT MOSKOW, CRYSTAL WELCH, KAREN GALATIS, RACHEL CAMILLERI, ERIC CAMILLERI, MICHELLE APMAN, ANNE CLARKE, DALE BORMANN, IRINA BORMANN, REBECCA WITHERUP, ALISON CRIST, ADAM HILKERT, ELIZABETH MARKO, JAMES BROWDER, DAVID RUFF, LISA HICKS, TAYLOR APPELT, DEWAYNE PACELEY, CRIS MANNING, AMBRY PRATER, AND MICHELLE RISER, on behalf of themselves and all others similarly situated, | No. CIV09-00529-DGC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| vs. | |
| PETLAND, INC. and THE HUNTE CORPORATION; ABC CORPS 1-100; and JOHN DOES 1-100, | |
| Defendants. | |

# TABLE OF CONTENTS

**PAGE**

I.    NATURE OF THE CASE ................................................................. 1

II.   JURISDICTION AND VENUE ..................................................... 3

III.  PARTIES ........................................................................................ 4

    A.    Plaintiffs ....................................................................... 4

    B.    Defendants ................................................................... 15

IV.  FACTS ......................................................................................... 16

    A.    The Puppy Mill Industry ........................................... 16

    B.    The Creation of a Fraudulent Market for
          Puppy Mill Puppies ................................................... 18

    C.    Petland's Unlawful Scheme Leaves a Wake of
          Consumer Complaints ................................................ 24

    D.    The Petland Warranty Perpetuates the Scheme
          to Defraud Consumers ............................................... 30

    E.    The Humane Society of the United States' Investigation
          Confirms Petland's Rampant Use of Puppy Mills ..... 32

V.   CLASS ACTION ALLEGATIONS ............................................ 39

COUNT I  VIOLATIONS OF RICO, 18 U.S.C. § 1962(c) ................ 41

    A.    Petland Enterprise ..................................................... 42

    B.    Affect on Interstate Commerce ................................. 43

    C.    Defendants' Association with the Enterprise ............. 43

    D.    Defendants' Participated in the Conduct of the Enterprise ........................ 43

    E.    Pattern of Racketeering ............................................. 44

          1.    Formation of a scheme or artifice to defraud ................... 44

i

2. Use of interstate communications in furtherance of the scheme ............................................................. 45

3. Defendants specifically intended to deceive Plaintiffs and the class about the origin and value of the Petland Puppies ............................................. 45

F. Injury to Plaintiffs and the Class ................................................. 46

COUNT II  VIOLATIONS OF RICO, 18 U.S.C. § 1962(D) ........................................... 46

A. Defendants Knew of and Agreed to the Petland Scheme ........................... 47

B. Defendants furthered or facilitated the criminal endeavor of the Petland Enterprise ...................................................................... 48

C. Injury to Plaintiffs and the Class ................................................ 49

COUNT III  VIOLATION OF MULTI-STATE CONSUMER PROTECTION LAWS ........................................................................... 50

COUNT IV  UNJUST ENRICHMENT ........................................................................... 73

COUNT V  VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT,  R.C. § 1345, *et seq*. ................................................................. 73

TOLLING OF STATUTE OF LIMITATIONS ................................................. 74

PRAYER FOR RELIEF ........................................................................... 74

JURY DEMAND ........................................................................... 75

ii

Jodell Martinelli, Stephanie Booth, Melia Perry, Abbigail King, Nicole Kersanty, Ruth Ross, Cheryl Huston, Allan Huston, Gianna Scappucci, Janie Griffin, Elliot Moskow, Crystal Welch, Karen Galatis, Rachel Camilleri, Eric Camilleri, Michelle Apman, Anne Clarke, Dale Bormann, Irina Bormann, Rebecca Witherup, Alison Crist, Adam Hilkert, Elizabeth Marko, James Browder, David Ruff, Lisa Hicks, Taylor Appelt, Dewayne Paceley, Cris Manning, Ambry Prater and Michelle Riser (hereafter collectively referred to as "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, bring this class action seeking damages, injunctive and declaratory relief, as well as attorneys' fees and costs against Defendants, Petland, Inc. ("Petland"), The Hunte Corporation ("Hunte"), ABC Corps. 1-100 and John Does 1-100 (collectively "Defendants"), and upon information and belief, and in connection therewith, allege as follows:

## I.  NATURE OF THE CASE

1.    The scheme to defraud Defendants have orchestrated and executed here manufactured a fictitious market for puppy mill puppies by misrepresenting these puppies as healthy, which allowed Petland to sell them at enormous profit while burdening Plaintiffs and members of the Class with the lifelong care of a sickly puppy mill puppy.  This putative class action seeks to end the deceptive practices of Petland relating to the marketing and sale of puppy mill puppies across the nation, and recover monies for the thousands of consumers who were victimized by their unscrupulous conduct.

2.    Petland is a retail pet store with approximately 115 retail locations in 31 states. Each of these retail locations operate pursuant to a set of procedures identified as the Petland "System," whether it is owned by Petland or operates as a franchised business under the direction and control of Petland ("Petland franchisee").  As part of this "System," Petland requires that each of its retail locations operate uniformly in the sales of puppies, participate in the effective "national refund/return policy" established by

1

Petland, and purchase puppies from suppliers it has approved, such as Hunte, who are puppy mills or puppy mill brokers.

3.     Defendants specifically intended to deceive Plaintiffs and the Class by representing the puppies being purchased as "healthy" although they knew the puppies to be unhealthy due to the puppy mill conditions under which they were bred and reared. In the sale of each puppy to Plaintiffs and the Class, Petland uniformly misrepresented the puppy as "healthy" pursuant to their uniform standards for selling puppies through a written health certificate and/or warranty provided at the time of sale.  Hunte, the largest single supplier of puppies to Petland, perpetuates this misrepresentation on its website for puppies it brokers to Petland as the "healthiest puppies on the planet" with "comprehensive musculoskeletal criteria for accepting puppies".

4.     Defendants, however, know these puppies were unhealthy due to fact they were bred in a puppy mill, and mislead consumers to the contrary to consummate the puppy's sale.  Plaintiffs and members of the Class purchased their puppies based on their belief that the puppies were healthy, which was false.

5.     In furtherance of their scheme, Petland's website (www.petland.com) – the only website any Petland location can utilize – along with its national advertising programs also uniformly misrepresent the puppies as "the finest available – happy and healthy family" puppies from "professional and hobby breeders who have years of experience in raising quality family pets," which are "USDA approved."  Although Petland knows puppy mill puppies are not "the finest available," or "healthy," and its puppy mill suppliers are not "professional and hobby breeders who have years of experience in raising quality family pets," many of who are not "USDA approved," it consciously deceives the consumer by convincing them: (i) that the puppy is healthy; and (ii)  that the puppy was not bred in a puppy mill.  This is the scheme to defraud upon which Plaintiffs and the Class relied to their detriment.

6.     This scheme is carried out by Petland retail locations across the country that sell the puppy mill puppies.  Its distribution capabilities create the demand or puppy mill puppies where there would otherwise be none given their well-documented health and socialization issues.  Without regard for the serious concerns about the health and well-being of the animals sold or forced to continually breed, Petland requires its retail locations use specifically approved puppy mills or puppy mill brokers to purchase puppies for resale to the public.

7.     This scheme to misrepresent the health and origin of these puppy mill puppies to consumers has left thousands of families in its wake suffering from emotional turmoil and significant monetary losses as they grapple with diseased and dying puppies purchased at Petland stores throughout the United States.  Plaintiffs seek to expose Defendants' fraudulent practices for what they are, violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962, and state consumer protection statutes.

## II.     JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, 18 U.S.C. § 1964(c), and because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68.  This Court also has jurisdiction under the Class Action Fairness Act of 2005 and section 28 U.S.C. § 1332, as revised, pursuant to which this Court has diversity jurisdiction because some members of the proposed class are citizens of States different than Defendant, and because the amount in controversy exceeds the sum or value of $5,000,000.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391; 18 U.S.C. § 1965(a) because many of the illegal acts giving rise to this case occurred in this District and defendant Petland conducts substantial business in the District.

**A.    Plaintiffs**

10.    Plaintiff, JoDell Martinelli, is a member of the Humane Society of the United States and a citizen of Arizona residing in Mesa, Arizona.  On January 18, 2005, she purchased a three month-old wolf sable Pomeranian puppy from her local Petland store and named him Patrick.  Ms. Martinelli purchased Patrick with the specific understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  She was charged nearly $2,000.  When she purchased Patrick he seemed a little lethargic and she thought he might not be well, but Petland provided a warranty of good health.  Shortly after she brought Patrick home he began to suffer from diarrhea and vomiting, which she had treated at the veterinarian Petland required.  Sometime later Patrick began to favor his back left leg and to walk only on three legs.  At eleven-months old he was diagnosed with a luxating patella on both of his back legs caused by improper breeding at a puppy mill.  The veterinarian found that both of Patrick's back knees were inflamed, but especially the right knee, and recommended surgery on both knees.  The Petland store in Mesa is no longer in business.  Beyond the purchase price of Patrick, Ms. Martinelli expended monies for his care caused by his poor health.  Patrick was bred at Dgara Kennels, a puppy mill, and sold to Petland through a puppy mill broker, Pine Springs Pets, Inc.  As of January 2, 2007, Pine Spring Pets, Inc.'s license under the Animal Welfare Act was revoked.  Neither Petland nor Pine Spring Pets, Inc. responded to Ms. Martinelli's concerns over Patrick's condition.

11.    Plaintiff Stephanie Booth is a citizen of Arizona residing in Flagstaff, Arizona.  Ms. Booth's daughter worked at the Flagstaff Petland store in 2007 and felt sorry for the 4-month old Bloodhound puppy, who was kept in a cage that was too small for him.  The Booth Family purchased the puppy, whom they named Tucker, in June 2007.  Ms. Booth purchased Tucker with the specific understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry

practices. Tucker was diagnosed with orbital cancer and put to sleep in October 2007 at 7 months of age. He experienced horrible separation anxiety and health issues from purchase date until death. Beyond the purchase price of Tucker, Mrs. Booth has expended monies for his care caused by his poor health.

12. Plaintiff Melia Perry is a citizen of Illinois residing in Urbana, Illinois. She purchased her dog from a Petland store in Tinley Park, Illinois in July of 2008. Ms. Perry purchased this Miniature Pinscher for $899.00 with the understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices. Ms. Perry's puppy was diagnosed with Kennel Cough after being purchased, requiring months of veterinary treatment. Beyond the purchase price of the puppy, Ms. Perry has expended monies for his care caused by his poor health. Ms. Perry's puppy was bred by Devin Lamont and sold to Petland through a puppy mill broker, Conrad's Cuddly Canines LLC.

13. Plaintiff Abbigail King is a citizen of Georgia residing in Wrightsville, Georgia. She purchased her dog, Baron Von Minchfield ("Minchy"), a 10-week old Miniature Pinscher from a Petland store in Duluth, Georgia for $800.00 on November 7, 2007. Ms. King purchased Minchy with the understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices. Less than a year after his purchase, Minchy was diagnosed with Progressive Retinal Atrophy which is an inherited disorder that will ultimately lead to permanent blindness. In addition, one day after his purchase on November 8, 2007, Minchy was diagnosed with coccidia, an intestinal parasite, that can cause diarrhea and weight loss. Ms. King has been, and will continue to, incur significant expense for Minchy's veterinary care for the duration of his life. Beyond the purchase price of the puppy, Ms. King has expended monies for his care caused by his poor health. Minchy was bred at Wald Kennel, a puppy mill. Wald Kennel lacks the necessary licensure from the USDA.

14.  Plaintiff Nicole Kersanty is a member of the Humane Society of the United States and a citizen of Michigan who resides in Fowlerville, Michigan.  She purchased her dog, Mainerd, a Boston Terrier, from a Petland Store in Novi, Michigan for $999.99 with the understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Instead, Mainerd was sold with a congenital spinal condition in which some of her vertebrae have not formed completely while others have fused together causing tissue to grow underneath along with possible nerve damage.  Mainerd is now receiving steroid treatments for her ailments and may require expensive spinal surgery.  As a result, Ms. Kersanty has incurred, and will continue to incur, significant expense for Mainerd's veterinary care.  Mainerd was bred by Rosalie Claxton of VR's Country Puppy, a Missouri puppy mill.

15.  Plaintiff Ruth Ross is a citizen of Ohio residing in Circleville, Ohio.  She purchased her dog, Sir Oscar Brassones Bache ("Oscar"), an 11-week old Old English Bulldog from a Petland store in Chillicothe, Ohio on September 17, 2007.  Ms. Ross purchased Oscar for $1,600.00 with the understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Less than a week after her purchase of Oscar, he became lethargic, refused to eat or drink, and suffered from a high fever. It was not until after numerous trips to the veterinarian that on November 14, 2007, Oscar's health finally improved. Beyond the purchase price of the puppy, Ms. Ross has expended monies for his care caused by his poor health.  Oscar was bred by Cindy Slaven at Rusty Spurr Kennel, a puppy mill. Rusty Spurr Kennel lacks the necessary licensure from the USDA.

16.  Plaintiff, Rebecca Witherup, is a citizen of Ohio residing in Galloway, OH.  On July 4, 2007, she purchased a Japanese Chin puppy from her local Petland store and named him Gizmo.  Mrs. Witherup purchased Gizmo for $449.99 with the specific understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Gizmo was brokered to Petland by Hunte.  Only three days later, on July 7, 2007, Gizmo was barely alive and

under emergency veterinary care. Gizmo did survive, but it was determined that he was deaf. Gizmo was sold to Hunte, a puppy mill broker, for Petland. Beyond the purchase price of Gizmo, Mrs. Witherup has expended monies for his care caused by his poor health.

17. Plaintiff, Alison Crist, is a citizen of Pennsylvania residing in Chambersburg, PA. On December 12, 2008, she purchased an English Bulldog puppy from her local Petland store and named her Bella. Mrs. Crist purchased Bella for $2,710 with the specific understanding that she was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices. Within 24 hours of purchase, Bella was limping and diagnosed with luxating patellas in both hind legs within a week. Bella was sold to Hunte, a puppy mill broker, for Petland. Beyond the purchase price of Bella, Mrs. Crist has expended monies for Bella's care caused by her poor health.

18. Plaintiff, Ambry Prater, is a resident of Missouri. On December 27, 2008, she purchased a Yorkshire Terrier from her local Petland store. Mrs. Prater purchased her puppy for $1,400.00 with the specific understanding that she was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices. The puppy was diagnosed with parvo in January 2009. Treatment for the puppy consisted of four days of hospitalization costing approximately three thousand dollars. Beyond the purchase price, Mrs. Prater has expended monies for her puppy's care caused by her poor health.

19. Plaintiff, Adam Hilkert, is a citizen and resident of Indiana. On March 1, 2009, he purchased a Yorkshire Terrier from a Petland store in Pennsylvania, and named her Grace. Mr. Hilkert purchased Grace for $1,519.99 with the specific understanding that she was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices. Grace was hospitalized by March 4, and died on March 9, 2009, eight days after purchase from a parasite that was present at the time of

sale.  Grace was sold to Hunte, a puppy mill broker, for Petland.  Beyond the purchase price of Grace, Mr. Hilkert has expended monies for Grace's care caused by her poor health.

20.   Plaintiff, Elizabeth Marko, is a resident of Pennsylvania.  On April 14, 2008, she purchased a Shetland Sheepdog from her local Petland store, and named him Baxter.  Mrs. Marko purchased Baxter for $1,299.99 with the specific understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Within months, however, Baxter was diagnosed with a congenital disorder, renal dysplasia, and was euthanized on September 23, 2008, just four months after purchase.  Baxter was sold to Hunte, a puppy mill broker, for Petland.  Beyond the purchase price, Mrs. Marko has expended monies for Baxter's care caused by his poor health.

21.   Plaintiff, James Browder, is a resident of South Carolina.  On April 8, 2009, he purchased a Maltese from his local Petland store, and named him Harry.  Mr. Browder purchased Harry for $1,299.99 with the specific understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Within the first month of ownership, Harry was diagnosed with giardia and a bowel disease.  Beyond the purchase price, Mr. Browder has expended monies for Harry's care caused by his poor health.

22.   Plaintiff, David Ruff, is a resident of South Carolina.  On January 25, 2009, he purchased a Bernese Mountain Dog puppy from his a North Carolina.  Mr. Ruff purchased his puppy for $950.00 with the specific understanding that the puppy was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  In March 2009, less than two months after purchase, his puppy underwent salvage surgery for severe hip dysplasia having the femor head removed.  The puppy was less than seven months of age.  Mr. Ruff's puppy was

brokered to Petland by Hunte.  Beyond the purchase price of his puppy, Mr. Ruff has expended monies for the puppy's care caused his poor health.

23.  Plaintiff, Lisa Hicks, is a member of The HSUS and resident of Tennessee.  On August 9, 2006, she purchased a Cavalier King Charles Spaniel puppy from her local Petland store and named her Maggie.  Mrs. Hicks purchased Maggie for $1,449.99 with the specific understanding that she was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Within a year of purchase, Maggie required a double hip dysplasia surgery and a knee patella surgery.  Beyond the purchase price of Maggie, Mrs. Hicks has expended monies for the puppy's care caused by her poor health.

24.  Plaintiffs, Taylor Appelt and Dewayne Paceley, are residents of Texas.  On July 22, 2008, Plaintiffs purchased an English Bulldog from their local Petland, and named him Benson.  They paid $4,799.99 for Benson with the specific understanding that she was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Within a year of purchase, Benson had surgery for a corkscrew tail on June 1, 2009, and suffers from Generalized Demodectic Mange.  Benson was brokered to Petland by Hunte.  Beyond the purchase price of his puppy, Mr. Paceley and Ms. Appelt have expended monies for Benson's care caused by his poor health.

25.  Plaintiff, Cris Manning, is a resident of Texas.  On January 20, 2007, he purchased a Miniature Yorkie puppy from his local Petland store, and named him Petey.  Mr. Manning purchased Petey for approximately $1,700.00 with the specific understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  When Petey came home, he was hypoglycemic and infected with Bordatella.  While being treated for Bordatella, Petey lost all his hair due to a congenital defect: an undescended testicle.  Beyond the

purchase price of Petey, Mr. Manning has expended monies for his care caused by his poor health.

26.   Plaintiff, Michelle Apman, is a resident of Minnesota.  On April 1, 2008, she purchased a Miniature Poodle puppy from her local Petland store, and named him Jasper.  Jasper was purchased for $599.99 with the specific understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  When Jasper came home, he was diagnosed with pneumonia, a double ear infection and parasites.  Beyond the purchase price of Jasper, Mrs. Apman expended monies for his care caused by his poor health.

27.   Plaintiff, Michelle Riser, is a resident of West Virginia.  On September 26, 2007, she purchased a Doberman Pinscher puppy from her local Petland store.  Mrs. Riser purchased him for $599.99 with the specific understanding that the puppy was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Two days after purchase, her puppy was diagnosed with Rickets, which has now advanced in his front legs to a bow of approximately 120 degrees in each making it difficult and painful for him to even walk.  Beyond his purchase price, Mrs. Riser expended monies for the puppy's care caused by his poor health.

28.   Plaintiffs, Cheryl and Allan Huston, are citizens of the State of Florida, who reside in Sarasota.  Plaintiffs Huston purchased a female Welsh Pembroke Corgi from the Bradenton, Florida Petland store on February 28, 2006, for $599.94.  Plaintiffs named their new puppy Gladys.  Plaintiffs Huston purchased Gladys with the specific understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Within 3 days of purchase from Petland, Gladys became ill with bloody diarrhea.  She had been certified healthy and has since been diagnosed with a defective digestive system.  Investigation by Plaintiffs Huston after their purchase led them to discover that Gladys had been treated

for the same ailments prior to her sale, none of which was disclosed by Petland. Plaintiffs Huston sought coverage for Gladys under the Petland Warranty, but their request was denied. Gladys will live on a special diet and medication for the rest of her life. Plaintiffs Huston have spent more than $4,000.00 on veterinary care for Gladys.

29. Plaintiff, Gianna Scappucci, is a citizen of the State of Indiana, who resides in Westfield. Plaintiff Scappucci purchased Griffin, a 3 month old male Shih Tzu from the Petland in Carmel, Indiana on December 6, 2008, for $944.11. Plaintiff Scappucci purchased Griffin with the specific understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices. In spite of this understanding, Plaintiff Scappucci was forced to euthanize Griffin on April 9, 2009, following extensive veterinary treatment over the 4 months of his life, including a week stay at the Purdue Veterinary Clinic. Following an autopsy, it was discovered Griffin suffered from a fatal lung disease. Although Petland refunded Plaintiff Scappucci's the $944 she paid for Griffin; Petland refused to compensate Plaintiff Scappucci for the more than $15,000 spent on veterinary treatment during his short life.

30. Plaintiff, Janie Griffin, is a citizen of the State of Kansas, who resides in Olathe. Plaintiff Griffin purchased a female English Bulldog named Betty Boo from the Petland in Olathe, Kansas for $2,404.25 on November 8, 2008. Plaintiff Griffin purchased Betty Boo with the specific understanding that she was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices. Betty Boo is a puppy mill puppy that was brokered to Petland by Defendant Hunte. At 6 months old, Betty Boo was diagnosed by two different vets with having a corkscrew tail, which means her tail is growing back into her body. Betty Boo's tail is also infected and Plaintiff Griffin is desperately trying to correct the situation with a veterinary specialist. Betty Boo needs surgery before the infection worsens and the tail does serious damage by growing into the intestines or disrupting her spinal column. Plaintiff Griffin has been

forced to pay out of pocket for Betty Boo's veterinary treatment. Plaintiff Griffin attempted to contact Defendants Petland and Hunte, but neither responded.

31. Plaintiff, Elliot Moskow, is a citizen of the State of Maine, who resides in Lewiston. In October 2008, Plaintiff Moskow purchased a Yorkshire Terrier named Coco from the Petland store in Topsham, Maine. Plaintiff Moskow purchased Coco with the specific understanding that she was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices. Indeed, Plaintiff Moskow specifically asked the Petland representative at the time of purchase whether "Petland received their puppies from puppy mills" to which he was assured they did not. The day Coco arrived home, she suffered from a cough. Plaintiff Moskow immediately took her to the vet and she received medication for kennel cough. Coco's condition, however, continued to worsen, and Plaintiff Moskow rushed her to the emergency veterinary clinic. Following an x-ray, it was discovered Coco had a collapsed lobe of her lung and pneumonia. Plaintiff Moskow was advised that Coco suffered from this condition for awhile and she did not receive any treatment from Petland. Plaintiff Moskow has been forced to pay out of pocket for Coco's veterinary treatment.

32. Plaintiff, Crystal Welch, is a citizen of the State of Maine, who resides in Biddeford. On December 29, 2005, Plaintiff Biddeford purchased an American Eskimo named Tiffany from the Petland store in Topsham, Maine for $999.00. Plaintiff Welch purchased her puppy with the specific understanding that she was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices. After bringing Tiffany home, she began almost immediately began to suffer from seizures. After several visits and without diagnosis, Tiffany's vet suggested she see a specialist. Tiffany underwent a dual cavity ultrasound of the heart and liver, which led to the diagnosis of syncope. Syncope can only be treated through surgery to implant a pacemaker; otherwise, the seizures will cause Tiffany to stop breathing and die. The pacemaker surgery is very costly and Plaintiff Welch is currently unable to pay

for it after spending significant sums of money on her veterinary bills to date. Plaintiff Welch contacted Petland about Tiffany's condition, however, Petland failed to meaningfully respond.

33. Plaintiff, Karen Galatis, is a citizen of the State of Massachusetts, who resides in Arlington. On August 3, 2008, Plaintiff Galatis purchased a male Lasa Apso named Gizmo for $350.00 from the Petland in Manchester, New Hampshire. Plaintiff Galatis was told by the Petland employees that Gizmo was on sale for $350, down from $1000. Plaintiff Galatis purchased her puppy with the specific understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices. At the time of sale, Plaintiff Galatis was assured by Petland employee Bill Sturgeon that Gizmo: (1) had never been sick, (2) was up to date on his shots, (3) was not hypoglycemic; and (4) was lethargic and quiet only because he was stuck in a cage all day long. As it turned out and contrary to these representations, Gizmo was very sick indeed. Plaintiff Galatis was required to take Gizmo to the vet the morning after brining him home – August 4 - because he was not eating, was acting strangely and his overall health was not good. Following a battery of tests, Gizmo was diagnosed with hypoglycemia, an infection, a parasite – Giardia, low platelet count, and high phosphorus levels. Plaintiff Galatis spent over $350.00 between August 4 and 5 on medications to remedy Gizmo's condition. Plaintiff Galatis contacted Petland, and Bill Sturgeon, about the representations regarding Gizmo's health at the time of sale. Petland denied any liability and refused to refund any of Plaintiff Galatis's purchase price, and instead, offered her $72.00 to resolve her warranty claim.

34. Plaintiffs Rachel and Eric Camilleri are citizens of the State of Michigan, who resides in Heartland. On March 30, 2008, Plaintiff Camilleri purchased a female Havanese from the Petland in Heartland, Michigan for $1,599.99. Plaintiff Camilleri purchased her puppy with the specific understanding that she was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices. At the time of sale, Plaintiff Camilleri was given the assurance that their puppy

was in good health.  A few months after purchase, in June 2008, routine blood work reveal a defect with the puppy's liver.  The puppy was referred to Michigan Veterinary Specialists for further testing; and after a consultation, ultrasound, and other blood tests, the vets decided that the best option was to do an exploratory surgery, at a total cost of $3,917.61.  Following the surgery, the puppy now requires a special diet.  The treatment has cost, and will continue to cost, Plaintiff Camilleri thousands of dollars.  Beyond the purchase price, Plaintiff Camilleri has expended monies for her care caused by her poor health.

35.   Plaintiff Anne Clarke is a citizen of the State of North Carolina, who resides in Charlotte.  On March 19, 2005, Plaintiff Clarke purchased a female Cairn Terrier puppy named Lulu from the Petland in Charlotte, North Carolina.  Plaintiff's Clarke's puppy was bred in a puppy mill owned and operated by Kathine Blomberg of Versailles, Missouri, and brokered to Petland by Defendant Hunte Corporation. Plaintiff Clarke purchased her puppy with the specific understanding that she was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Unfortunately, since the moment of purchase, Lulu has been ill and most recently was diagnosed with diabetes.  Lulu's treatment has cost, and will continue to cost, Plaintiff Clarke thousands of dollars.  Beyond the purchase price, Mrs. Prater has expended monies for her care caused by her poor health.

36.   Plaintiffs Dale and Irina Bormann are citizens of the State of Ohio, who reside in Willoughby.  On August 31, 2008, Plaintiffs Bormann purchased a male English Springer Spaniel named Sport for $549.00 from the Petland store in Mentor, Ohio.  Plaintiffs Bormann purchased their puppy with the specific understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Shortly before Sport's first birthday, he was diagnosed with congenital renal failure and will require medication the rest of his life. Sport's treatment has cost Plaintiffs Bormann more than $3,000.  Beyond the purchase price, Plaintiffs Bormann has expended monies for her care caused by her poor health.

37.   Plaintiff Mohamad El Naamani is a citizen of the State of Florida, who resides in Wesley Chapel.  On June 4, 2008, Plaintiff El Naamani purchased a male Yorkshire Terrier from the Petland store in Wesley Chapel, FL.  Plaintiff El Naamani purchased his puppy with the specific understanding that he was healthy, and bred under safe and humane conditions by a reputable breeder with proper canine husbandry practices.  Shortly before the puppy's first birthday, he was diagnosed with luxating patellas.  Treatment of this condition has cost, and will continue to cost, Plaintiff El Naamani thousands of dollars.  Beyond the purchase price, Plaintiff Naamani has expended monies for the puppy's care caused by his poor health.

38.   Petland specifically represented to each Plaintiff during the transaction that that they were purchasing a "healthy" puppy.

**B.    Defendants**

39.   Defendant, Petland, Inc. ("Petland"), is an Ohio Corporation whose principal place of business is 250 Riverside St., Chillicothe, OH 45601.  Petland is in the retail pet industry and is the largest national retailer selling puppies to consumers.  Petland conducts its operations through approximately 140 retail stores in the United States and 63 additional stores in foreign markets.  Each of these retail stores is operated by Petland or its franchisee.  The global operations of Petland are conducted from its offices in Chillicothe, Ohio.  The puppies sold by Petland to Plaintiffs and Class Members were whelped at a puppy mill.

40.   Defendant, The Hunte Corporation ("Hunte"), maintains its principal place of business at 121 N. Royhill Boulevard, Goodman, Missouri.  Hunte is the world's largest distributor of puppies to pet stores, and is an approved Petland supplier.  Hunte maintains a "Petland Service Team" to assist in puppy sales to Petland locations across the country.  The puppies sold by Hunte to Petland for sale to class members were whelped at puppy mills.

41.   Defendants, ABC Corps. 1-100, are corporate entities within the United States who are approved suppliers of puppies to Petland.

42.   Defendants, John Does 1-100, are non-corporate entities within the United States who are approved suppliers of puppies to Petland.

## IV.     FACTS

### A.     The Puppy Mill Industry

43.   A puppy mill is generally defined as: "a dog breeding operation in which the health of the dogs is disregarded in order to maintain a low overhead and maximize profits." *Avenson v Zegart*, 577 F. Supp. 958, 960 (D. Minn. 1984).

44.   Puppy mills are, in part, the unfortunate result of an exploited economic recovery concept implemented in the late 1940s to assist rural Midwestern farmers who were suffering widespread crop failures.  These were among the first commercial puppy breeding kennels.

45.   The market for these mass-produced puppies was created at that time through major department store chains like Sears, Roebuck & Co. and Montgomery Ward who began selling puppies during the 1950s.

46.   From this market, large scale specialty retail pet stores were born, including Petland.

47.   These puppy breeding operations soon morphed into an assembly line manufacturing process where commercial breeders sought to maximize profits by producing the largest possible quantity of puppies without regard for the health and welfare of the breeder dogs or their puppies.

48.   To operate this puppy production line, female dogs are bred at every opportunity without sufficient recovery time between litters.  Once these breeding females are physically depleted to the point they lose the ability to reproduce, they are generally destroyed using inhumane methods.  Thus, following a cruel life of breeding litters upon

16

litters of puppies, the sire and dam of that puppy mill puppy is highly unlikely to ever make it out of the mill alive.

49.   While alive and forced to reproduce, the breeding female and her puppies are confined to a wire cage barely large enough to turn around in, sometimes exposed to the elements, twenty-four hours a day, seven days a week and three hundred sixty-five days a year.  These cages are frequently stacked upon one another in columns to conserve space so the puppy mill can maximize its number of breeding females, and therefore, its production of puppies.  These cages in which the breeding female spends her entire life, and the puppies' first several weeks of life, are floored with wire mesh to facilitate waste removal and cleanup without regard for the health and wellbeing of either the puppies or their mother.

50.   The conditions at these puppy mills have degenerated to a point of disregard for the welfare of the dogs leaving them in unsanitary, overcrowded conditions without adequate veterinary care, food, water, exercise or mental stimulation and socialization.

51.   As a result of these conditions and a disregard for proper canine husbandry practices, puppies whelped at puppy mills, and puppies delivered by puppy mill brokers such as Hunte, were sold to Plaintiffs and the Class, and are highly prone to debilitating and life threatening conditions, such as:

| Congenital and Hereditary Conditions | Diseases and Infirmities |
| --- | --- |
| Epilepsy | Giardia |
| Heart Disease | Parvovirus |
| Kidney Disease | Distemper |
| Musculoskeletal Disorders | Upper Respiratory Infections |
| Endocrine Disorders | Kennel Cough / Pneumonia |
| Blood Disorders | Heartworm |
| Deafness | Mange |

| Eye Problems | Intestinal Parasites / Chronic Diarrhea |
| --- | --- |
| Respiratory Disorders | Fleas / Ticks |
| Mental Instability | Oral/Dental Problems |

52.   Proper husbandry practices would significantly reduce the congenital and/or hereditary conditions since discontinuing the breeding of a sire and/or damn will prevent the passing of the condition to the puppy.  Similarly, the unsanitary conditions of a puppy mill in which the puppies are bred and live the first eight weeks of life manifest themselves in pervasive illness and disease, which is remedied by breeding puppies in a humane, sanitary environment.  These are the byproducts of breeding at puppy mills, which compromises the puppies' health and are known to Defendants.

53.   Petland knowingly requires its retail locations throughout the United States to sell these unhealthy puppy mill puppies that are used to stock Petland retail stores throughout the United States.

54.   There is also a widely acknowledged stigma associated with puppy mills because of their factory-style operation and irresponsible breeding, where profit is given priority over the health and welfare of the dogs being bred and sold.  This stigma virtually eliminates the demand for puppy mill puppies and likewise, Petland's ability to charge exorbitant prices for those puppies know to suffer the diseases created by breeding in puppy mills.

**B.      The Creation of a Fraudulent Market for Puppy Mill Puppies**

55.   Because of the increasing awareness of puppy mills, including the inhumane treatment of the breeding dogs and known health problems associated with the puppies bred there, the demand for puppy mill puppies has virtually been eliminated.

56.   Each of the approximately 115 Petland retail locations throughout the United States operates as either a company-owned store or a franchised business.  However,

18

regardless of ownership, Petland controls the purchase of puppies stocked at every Petland retail store.

57.    The company-owned Petland retail stores are operated and controlled by Petland.  The Petland franchisees operate pursuant to a Franchise Agreement between Petland (Franchisor) and an investor who serves as the Petland franchisee.

58.    Like the company-owned retail stores, the Petland franchisee must operate pursuant to the Petland "System," defined in the Franchise Agreement as:

> the uniform standards, methods, techniques and expertise, procedures and specifications developed by [Petland] for establishing, operating, and promoting a retail animal care business specializing in the  . . .sale of pets [including] operating methods, procedures and techniques . . .personnel management and training . . .

59.    Upon information and belief, the particulars of the "System" are set forth in Petland's confidential "Manuals," which include, at a minimum, the Petland Operations Manual, Petland Advertising Manual and Petland Sales Manual.

60.    As it pertains to the sale of puppies, the Petland "System" uniformly executes the scheme to defraud alleged herein by misrepresenting the puppy being purchased as healthy, and not bred in a puppy mill.

61.    Petland misrepresented the puppies sold to Plaintiffs and members of the Class as healthy during each transaction in conjunction with the Petland "System" orally or through written health certificate and/or warranty provided at the time of sale.

62.    All Petland retail locations "shall be required to participate in the then current national refund/return policy as may be developed by and as may be modified from time to time by [Petland], in its sole discretion."  On information and belief, one of the "sales return policy programs" is this health certificate and/or warranty provided in each transaction.

63.    Each puppy sold to Plaintiffs and the Class was misrepresented as "healthy" to facilitate its sale, for example: "The puppy you have selected is warranted by this

Petland retailer to the original purchaser to be healthy at the time of purchase;" "The puppy you have selected is warranted by [Petland] to the original purchaser to be healthy at the time of sale." Yet, no puppy sold to Plaintiff or the Class was in fact healthy since each of them were inflicted with at least one malady common to puppies bred in puppy mills.

64. Petland further misrepresents the health of these puppies by claiming they are "the finest available – happy and healthy family pets." Knowing these puppies are from puppy mills, this statement is patently false. This mantra of Petland is used to deceive consumers as to the health and well-being of its puppies. It appears in written brochures mailed and/or provided to consumer in its retail locations, and published on the only website available for consumers to review for all Petland retail locations. *See* http://www.petland.com/AboutPetland/HealthyPets.htm (last viewed September 10, 2009); *Why Choose a Petland Puppy*, Where do Petland Puppies come from?

65. As a result, Plaintiffs and members of the Class purchased puppies from Petland that they were misled to believe were healthy.

66. Also, for each Petland retail location, Petland is expressly responsible for "determ[ing] the standards of quality for all pets, pet care".

67. Accordingly, the Franchise Agreement mandates as follow:

> Authorized Services and Products. Franchisee agrees that during the term of this Agreement it shall carry only those products and pets and offer those services which Franchisor has approved or which are purchased from suppliers approved by Franchisor. In furtherance and not in limitation of the foregoing, Franchisee agrees and acknowledges that it will not acquire puppies from unapproved brokers and/or breeders as identified by Franchisor, such as listing to be modified by Franchisor at its sole discretion.

68. The Franchise Agreement further identifies the control over "Approved Suppliers" that Petland has as Franchisor, stating:

> Franchisee agrees to equip, supply and inventory the Franchised Business with items supplied by Franchisor and

> Franchisor-approved vendors. If Franchisee desires to purchase from sources who have not previously been approved by Franchisor, Franchisee shall first secure Franchisor's written approval.

69. Petland selects the "Approved Suppliers," and therefore the puppy mills or puppy mill brokers who supply puppies to the Petland retail locations throughout the nation.

70. Since the Petland franchisee "is expressly prohibited from creating or maintaining its own independent website and agrees not to do so," Petland corporate maintains the only website at www.petland.com, and manages its content.

71. Petland, however, knowingly purchases from puppy mills or puppy mill brokers. Despite this knowledge, it uniformly misrepresented the origin of these puppies on its website as "professional and hobby breeders who have years of experience in raising quality family pets." *See* http://www.petland.com/AboutPetland/HealthyPets.htm (last viewed September 10, 2009).

72. Petland also misrepresents these puppy mills as "USDA approved," or "USDA licensed and have years of experience in raising quality family pets." *Why Choose a Petland Puppy*, Where do Petland Puppies come from?. Petland states it "pride[s] [itself] on [its] most diligent efforts to find healthy puppies." *Id.* Moreover, it represents that "members of Petland, Inc.'s Field Operations Team make personal inspections of breeder facilities to evaluate the level of animal care being provided." *Id.* Petland knows of the deplorable conditions under which these puppy mill puppies are bred. Therefore, Petland deliberately misleads consumers as to the health and origin of the puppies they sell.

73. Similarly, Petland's largest broker of puppy mill puppies, Defendant Hunte, represents that its puppies are from "the most reputable breeders," and that it is dedicated to providing "the absolute best care possible to every single puppy no matter what it

costs." *See* http://www.thehuntecorporation.com/puppycare.html (last visited September 10, 2009).

74.  Hunte further publicly represents that it has established a "comprehensive musculoskeletal criteria for accepting puppies from breeders by creating various grades for knees, hips, heart murmurs, and other health conditions." *See* http://www.thehuntecorporation.com/industryfirsts.html (last visited September 10, 2009).  Contrary to Hunte's representations, several consumers purchased Petland puppies provided by Hunte with the health problems it purports to screen and which likely could have been avoided if the breeders had engaged in safe, sanitary and humane breeding practices, for example:

a.  Janie Griffin purchased Betty Boo, an English Bulldog, from Petland in Olathe, KS.  Now 6-months old, she has been diagnosed as having a corkscrew tail, meaning that her tail is growing back into her body.  The tail is also infected. She needs surgery before the infection worsens and the tail does serious damage by growing into the intestines or disrupting the spinal column. Ms. Griffin has attempted to contact the Petland owner and Hunte (the puppy's broker) but has not had any success.

b.  Adelaide & David Ruff are retired and live on a fixed income.  They purchased a 4-month old Bernese Mountain Dog from Petland, who received the dog from Hunte.  A month later they had her operated on for severe hip dysplasia. The surgeon had to do the salvage surgery because the dysplasia was too severe to do the proper surgery for her age group.  She had the femur head removed (FHO). The cost of the operation and medicine was approximately $1,000.

c.  Adam Hikert who purchased his puppy, Grace, on March 1, 2009, from Petland, who received the dog from Hunte.  Grace hospitalized on March 4, 2009, and died on the early morning of March 9, 2009.

75.   Petland further misleads consumers by exploiting the low standards of the many breed registry companies.  Petland deceives consumers into believing that a pet's registration or ability to be registered at one of these many registry companies reflects the quality of the puppy while further concealing its puppy mill origin.  In reality, the registration of a puppy purchased at Petland provides no indication that the puppy is of a better quality than non-registered dogs, is capable of being shown or is healthy and free from congenital or hereditary defects.

76.   Additionally, Petland relies upon lax government licensure standards and infrequent inspections to dispel consumers' justifiable concern that their puppy may be whelped in a puppy mill.  To instill a false sense of consumer confidence, Petland characterizes its "Approved Suppliers" as "USDA Approved" or as a USDA "licensed breeder," but this does not alter the fact that these breeders are indeed puppy mills.

77.   Moreover, a large number of Petland's puppy mill suppliers are not even USDA "licensed breeders."

78.   Similarly, Petland's scheme to defraud consumers operates where its "Approved Sellers" are puppy brokers who obtain puppies from puppy mills.  The brokers, including Defendant Hunte, serve as middlemen between Petland and the puppy mills.  Since the direct transaction is between Petland and the broker, rather than the puppy mill itself, Petland is able to manufacture and maintain the fiction that the puppies it procures for sale are not from puppy mills.

79.   The puppy mills and their brokers sell puppy mill puppies to Petland retail locations for enormous profit.  This scheme ultimately results in a drastically inflated price to the consumer who purchases a puppy mill puppy, where the consumer would not otherwise pay such a high price for a dog of such origin.  Additionally, by fraudulently misrepresenting the origin of the puppies Petland offers for sale, consumers are duped into indirectly supporting the deplorable puppy mill industry.

80.   Petland benefits by its association with these puppy mill operations by having a constant supply of the most popular dog breeds.  But it does so by disregarding the health and well-being of the animals involved and by perpetuating nefarious breeding practices.

81.   It is Petland's policy and practice to conceal or misrepresent the material fact that the puppies it sells are from puppy mills.  If Petland openly disclosed the heinous conditions in which its puppies were bred, the artificial demand for puppy mill puppies would dissipate and Petland would be forced out of the puppy-selling business unless and until it relinquished all connections with puppy mills or their distributors.

82.   Petland expressly forbids any retail locations to "sell or permit the selling of pets . . . other than as authorized under this [Franchise] Agreement."

83.   Petland's scheme to defraud alleged herein has allowed Petland deceptively sell unhealthy puppy mill puppies to Plaintiffs and the Class.

**C.      Petland's Unlawful Scheme Leaves a Wake of Consumer Complaints**

84.   Petland's sales and marketing practices as complained of herein have reached epidemic proportions throughout the United States.

85.   Petland's scheme to defraud consumers injects thousands of sickly and/or dying puppies into families' homes every year, for example:

- **Travis of Madison WV (11/22/08)** - We purchased a teacup yorkie for our daughters for Christmas.  The dog never made a sound on the 30 minute drive home so we were able to keep her hid.  Little did we know that the reason the dog was quiet was because she was sick.  We were atimate about giving her the glucose gel prescribed.  In the few days that we had her she was taken to the vet about three times.  The final time they wanted to send her to an emergency animal hospital where she could have 24-7 care.  Being unable to afford this because we gave 2800.00 for the dog, we elected to call Petland.  They told us to bring the dog in and they would care for her.  A few days later we were told she passed away.  Our children were heartbroken and they tried to blame us.  However we had documentation from the vet.  They replaced our dog with a chihuahua (which we love), but her value was only 1400.00.  We are still stuck paying the full amount for the dog we began with.

24

- **Nicole of Santa Fe NM (11/20/08)** - On October 18, 2008 I purchased a Bichon Frise puppy from Petland in Rio Rancho, NM, which at the time of purchase, the Petland owner's brother Peter, who is the Manager, stated that the puppy was healthy. Within an hour of leaving Petland, the puppy was throwing up, but at that point in time, I thought the puppy was just nervous of her new surroundings. That evening, the puppy was coughing and her lungs sounded extremely congested with fluid. She was whimpering and had a very hard night. The next day, the puppy continued to throw up and was coughing with an extreme amount of fluid in her lungs. Her nose was bubbling mucus and I realized that something was terribly wrong. I immediately contacted the emergency veterinary clinic, as it was Sunday and they stated to get the puppy over there immediately. In route to the ER Vet Clinic, I contacted Peter, who agreed it was vital I get the puppy to the ER Vet and he apologized for the puppy being sick.

  After many tests and X-rays at the ER Vet Clinic, it was discovered that the puppy was suffering from Infectious Respiratory Disease and was at high risk for pneumonia. The Vet, reviewed the documentation that came with the puppy and noticed that mixed amongst all the paperwork, was an area that showed that only a few days earlier, the puppy had received very high doses of antibiotics and cough syrup. At this point, not only was I dealing with a very sick puppy, but she had now infected my other older puppy. The vet stated it was important that I take both puppies to their normal vet the next day. October 20, 2008 at 8:55am, I contacted Petland's owner Susan and told her that the puppy they sold me was very ill and that I had spoken with the store manager, Peter about the situation. At that time she denied that the dog could have been sick while in their possession. I stated to her that I had just bought the puppy from them, and asked her why the manager did not inform me that the puppy had been given high doses of antibiotics and cough syrup and was ill. Susan stated that it is common practice to give them high doses of antibiotics and cough syrup to prevent illness and denied their store did anything wrong.

  Later that day, I contacted Petland's Manager, Peter to inform him that the puppy had been seen at the Emergency vet clinic and that I was on my way to her normal vet to get both dogs checked. Once again, he apologized for the sick puppy and stated just to fax the bills over to Susan as soon as possible. After many tests, it was found that the puppy not only had Infectious Respiratory Disease, but had Giardia. Both of the puppies went through many awful tests and were put on many different medications to help them. The medical bills came to about $800. I faxed over the bills immediately to Susan Kern for reimbursement but to date have not received a dime. Everytime I contact her, she states that she will be sending out the check in a few days and gives me excuse after excuse as to why it wasn't sent the time before.

  I have taken off many days from work to care for the sick puppies losing time and money. The medical bills have piled up and have put an extreme strain on our finances. We have had to cut back on essentials for ourselves, to get the necessary medications and cover medical visits for the two puppies. I have many physical problems and having to care for the sickly puppies both day and night, has caused physical and emotional distress on me, as for weeks, I was unable to rest. This has been a complete nightmare.

- **Ryan of West Palm Beach FL (08/25/08)** - We bought a 9 week old male boxer puppy from Petland June 19th of this year. He had a parasite, but was treated and sold to us

25

with a certificate of health. We noticed him coughing and not gaining very much weight, so we took him to the vet complaining of the cough. We had blood tests and fecal tests run on the puppy and he was found to be anemic. He was put on vitamins and antibiotics, the vet assumed he may have had a blood parasite, but the medicine should take care of it according to the vet.

On August 20th, our puppy began acting different. He hid under our shed and was almost comatose. He wouldn't eat or drink (not like Rocky) and only moved around a little bit. We kept him warm and went to bed with him around 11pm. At 12:15am on Thursday the 21st, he was whining and had vomited in his crate and had bloody fluid leaking from his nose and anus. I rushed him to an emergency 24 hour vet and arrived at 12:45am. He died in my arms at the front door.

The vet said she had never seen a puppy die in such a way, and that he had completely leaked out on her exam table in the back. She offered to do a post death exam, but said it would cost around two thousand dollars. I did not have that money to spend. I only had my beautiful puppy for eight weeks.

Petland sold us a puppy knowing he had a parasite, Banfield did numerous studies and did not detect anything other anemia, which they also assumed was due to a parasite. He had been given all of the medication that he was prescribed. The corporate office of Petland today took our phone call and hung up on us when we wanted to place a complaint. We found the breeder that bred our puppy in Oklahoma and the president of the Oklahoma Boxer Club said that they felt sure it was a 'puppy mill,' which PetLand guarantees it does not buy its puppies from.

I would have to say this was the most traumatic experience I have ever had with a pet. People have to come to grips that older dogs are most likely going to pass at some point, but no one ever thinks so of a puppy, a four month old puppy. More than anything else, I would hope that PetLand would have to endure something substantial to ensure that this will never happen again to any of their customers. In total we spent around $1500 for the puppy itself, and around another $600 in vet bills.

- **Victoria of Skokie IL (08/17/08)** - We purchased a German Shepherd puppy 3/2/08 from Petland Niles. We contemplated whether or not to get a rescue Shepherd but the store convinced us that we didn't want to take any chances since we didn't know where the rescue dogs come from, after all, they can turn on you at any time.

On the other hand Petland puppies are a much better choice. The puppy had to be put to sleep 4 months and $5,000 later. It appeared that the dog had distemper despite all of the vaccinations he had supposedly received. According to several experts on canine immunology it most likely lay dormant in his system from the time he was a small puppy. The dog most likely came from a puppy mill where they live in unsanitary conditions with sometimes hundreds of other dogs. The puppy mill proprietors save money but inoculating the dogs themselves. They are not trained to administer vaccines correctly, do not store them properly, and often just skip dogs altogether.

We had our puppies blood tested to see if he had antibodies to distemper which he should have had he been inoculated and sure enough he did not. When we contacted the store

they said sorry about your dog but without an autopsy and proof that he had a congenital problem they were not responsible at all. When asked if they could contact the breeder to find out if there was a problem at their facility Petland stated that they worked with reputable breeders and that would not be necessary. We specifically asked if our dog came from a puppy mill and they said NO.

After researching a little further we found out that our dog not only most likely came from a puppy mill but it appeared that he may have come from one of the worst puppy mills in Iowa. This is consumer deception and fraud at its finest. The public pays a very high premium for dogs in good faith that the breeder had been researched by the pet store for them. They believe that is what they are paying for. It is completely the opposite. Petland is one of the largest distributors of puppy mill puppies. In fact, approximately 95% of their dogs come from puppy mills. Sometimes you are lucky and get a healthy dog but it is best not to take a chance since they are born into very unsanitary and unhealthy environments. Buyer be ware.

We owned the puppy for 4 months. Including purchase price, 1 month training at a boarding facility, and vet bills we have lost about $5,000. Our 3 year daughter is broken hearted and we have no recourse with the store.

- **Maria of Cameron TX (03/12/08)** - I purchased a White Siberian Husky as a Christmas gift for my 3-year-old son. About 4 days after I took her home, she developed an upper respiratory disease. I thought it was something minor, and so I took her to the vet. The puppy then started vomiting and having bloody diarrhea. She had lost her appetite and was growing extremely weak as each day went by. All of this led to having her hospitalized. For almost two weeks she stayed at the vet. I was so upset with Petland and tried calling them on many occasions to let them know what exactly was going on with our puppy. On every occasion they seemed sympathetic until I asked for a refund-- and everything changed.

Our puppy died on February 2, 2008. I purchased her on December 23, 2007, and the whole entire time she was in and out of the vet's. Since the store found out that my puppy died of distemper, they have not wanted anything to do with me. They will not answer my calls--and make up policies about emailing the manager only, rather than speaking to someone like it had been on other occasions. I have called the store, the store's vet clinic, and the corporate office, as well. I am getting nowhere. It is really frustrating that no one wants to talk to me about my situation. I have nowhere to turn, and it is making me very upset. I have sent every document that I have as supporting evidence about my claim, and still nothing.

I have paid $700.00 in cash and financed $1,300.00 through Petland's bank. With the late charges to the account the total is now about $1,400.00. I also paid around $800. 00 in vet bills. It has been a very frustrating time for me. Petland wants me to pay the remaining balance on my account without even reviewing my claim, saying that there is nothing that they can do for me. It is horrible to lose a pet and have to continue paying for it after it has passed. If anyone has any suggestions as to what I can do, please contact me.

- **Jessica of Ankeny IA (02/21/08) -** My husband and I got a Siberian husky from Petland January 20th. She seemed sick since the day we got her. We thought it was because she was stressed, she had diarrhea. We had called Tim the owner of Petland and he never called us back. We took her to the vet several times because we didn't want her to get dehydrated. He put her on some different meds. Nothing helped. Wednesday night (30th of January) she started to act really freaked out and crying so we thought she was in pain. My mom and I called Petland on Thursday the 7th and spoke to a young lady that works there. She stated that they were no long involved with Starch Pet Hospital where we were taking our new puppy too. I was very upset to find that out while my dog is dying at their place! We took her to the vet on Thursday and she started to have many of seizures in one hour. The vet took her home to his house overnight to watch her. He called Friday and said he had been giving her valium for her seizures. We put her down on Friday February 8th. Tim said he would pay for her and he hasn't we are getting bills now and he won't return our calls. I have already filed a complaint about Petland West Des Moines, Iowa with the Attorney General, Dept of Agriculture, Better Business Bureau and the Humane Society. I just thought you should know how your business is being run out of Iowa!

- **Guy of Cape Coral FL (02/10/08) -** I bought an Italian Greyhound in the end of 2006. The dog was ill the week after, throwing up and could not hold down food. I took the dog to the Vet linked to Petland; they told me to give her medicated food, and she should be okay in a few days. This dog was not eating or drinking, and was weak. And this was the advice of a Vet. After about 3 hours, the dog was whining and screaming all day. We finally took her to our own vet, and the dog had pneumonia, and was almost dead. We called Petland to state this, and they stated we should have revisited the vet they use, and would not pay the bill. Now the dog has chronic issues, spinal deformity, wobble syndrome, muscle and nerve issues.

  The results are this dog will have life-long medical needs beyond my ability to pay. These dogs are supposed to be well breed, and good blood lines; this looks like a mill puppy situation. The papers given when you buy the dogs state pure breed; the results of the dog I have purchased show this as being false. This dog now has to be seen by a nerve and spinal DR in Sarasota to see if this is life-challenging. They need to pay for this dog's medical, and return my money for selling me a sick dog. This is by no means a good experience. I love this dog, and she's family, and we'll do whatever it takes, but this company needs to be held accountable. And I will do whatever to make sure this is known.

- **Jessica of Coal City WV (01/11/08)** - We purchased an Italian Greyhound at PetLand. The dog itself was $1,393.88. (That's not including all of the other stuff we had to get for her. ) We had her for 5 days altogether. We took her on the third day for her first vet visit and found out that she had Kennel Cough. So we got the meds for her and started her on them. The next day when we got up she was vomiting and had bloody stool. We called PetLand and told them about the bloody stool, and they told us that it was normal for her to have bloody stool--that it could be from stress. But when her stool turned to nothing but runny blood, we took her to the vet. A Parvo test was run and came back positive. We told PetLand that we couldn't afford to keep her in the vet's, so they gave us a check and told us that if the dog made it through we would have the option to buy her back after she was well.

Well, she died tonight and we called PetLand and told them we paid in cash and we wanted cash back--not a check. So now we are waiting to see if they will do that. Our daughter is 2 years old, and this was her first puppy. We were attached, also. And now we're out a puppy and money for everything that we bought for the dog that can't be used again for another dog because she had Parvo. I think pet stores like PetLand should be closed down. Puppy mills are animal cruelty. If someone like you or me did half the stuff like they do to animals, we would be locked up for life. Why are they still in business? I just don't understand. I will probably be leaving more messages on here when we find out more from PetLand.

- **Janice of Louisville TN (11/18/07) -** I purchased a Maltese puppy from the above Petland on 11/10/07, 1:29 PM, according to receipt. The pup was apparently ill as it died while under the care of a veterinarian four days later. The cost of the Maltese and supplies (foods and a medication to prevent hypoglycemia) recommended by Petland came to a total of $1,260.58. The vet bill was nearly $300.00. The monetary and emotional cost has been great. When I called Ms. Adams, she expressed no concern about my loss, financial or emotional. She assured me that there was no warranty on the dog, and expressed no intent to reimburse me for selling me a sick dog.

- **Laurel of Bradenton FL (03/12/07) -** Bought a dog, now two years old, has been diagnosed with degenerative disc disease, Vet says it's genetic. Petland was buying pets from a rogue puppy mill called Pine Springs Pets. $1,000's of dollars in vet bills. Sadly, the contract with Petland only covers illness during the first year. Very smart. Most puppies don't show signs of genetic problems until around two years old.

- **Alison of Acworht GA (02/26/06) -** We purchased a puppy on Friday Feb 17th. My husband had originally gone by himself to look for a puppy. He came home and said he found a Boston Terrier/Bassett Hound Mix at Petland. We decided to go see the puppy. She was adorable. We got her out and she was very playful. We decided to put $100 deposit on her for 1 week so we could get things together for her at home. This puppy was for my 6 year old son. He was very excited that he named her right away "HARLEY". We went about 4 times to see her before we got her so my son could play with her. She was always so playful and sweet. We finally did pick her up on Friday.

I took her straight to the vet. She had a fecal done and I was told she had worms. She was given meds for the worms and was told that she might get sick. That night she played for a while then she started to get very sick. She got sick all over our house. She wouldn't move. The next morning I called the vet. We took her in. She ended up having Parvo. She was half dead. She had to be put on fluids right away. I called Petland and told the manager that we had just gotten her yesterday and that she had Parvo. I told him that all the other puppies were probably infected too. Because we did notice that everytime we went to see her she was in a different cage. Parvo is a very serious, contagious illness for puppies.

The manager wanted us to bring her to him so his vet could check her out. We told him it didn't matter what vet she saw as long as she was getting treatment and to take her off fluids to bring her to him she could die. She stayed at our vet from Sat to Mon night. We did bring her home Mon Feb 20th. She didn't move all night.

We took her to their vet Towne and Country on Tues. She has been there for 6 days so far. She is still there. I called 2 times on Tues to see how she was doing. Didn't get much info. Called Wed they never called back. So basically we need to decide what to do. We need to talk to the vet and the manager. I want all my vet bills paid for and I want full reimbursement for the puppy. She was $400. 00. I feel that this is only far after what trauma my family has been thru. My 6 yr old son keeps asking me why we got a sick puppy and is she going to die. He talks about her all the time. If she doesn't get better we can't get another puppy for at least 6mos to a 1yr because of the Parvo in our house.

86. The condition of these puppy mill puppies is not unfamiliar to Petland or its franchisees. For instance, in anticipation of an Indiana franchisee's grand opening, the very first batch of puppies from Defendant Hunte, a Petland "Approved Seller," included 60-65 puppies, over half of which were sickly or dying with a wide range of conditions including, parvovirus, pneumonia, respiratory infections, and ringworm.

87. An Ohio franchisee had a similar experience with puppy mill puppies from Defendant Hunte. In the initial batch of puppies from Hunte, many were sick and/or dying, including two puppies that were sold to consumers and died of canine parvovirus within days of their sale. Even the puppies from Hunte's initial shipment that survived soon began to display symptoms of illness requiring expensive veterinarian care.

88. No consumer seeks to obtain, and/or pay a premium price for a puppy mill puppy, given the emotional turmoil and additional expense associated with these puppies. And most purchasers would be appalled to learn that any portion of their purchase price was used to encourage unsafe and inhumane breeding practices.

**D.    The Petland Warranty Perpetuates the Scheme to Defraud Consumers**

89. Consistent with Petland's overarching scheme to deceive consumers as to the health of the puppies they sell, Petland provides purchasers of its puppy mill puppies a limited warranty. This limited warranty perpetuates Petland's scheme to defraud consumers as alleged herein by further facilitating the fiction that a consumer's new puppy is "healthy," rather than a sickly and/or dying puppy mill puppy. The limited warranty, however, offers consumers little to no protection from this reality, or the

damages to Plaintiffs and the Class resulting from the unhealthy nature of their puppy mill puppy.

90.  The limited warranty warrants the puppy against diseases and infirmities common to these Petland puppy mill puppies, such as: Canine Parvovirus, Distemper, Hepatitis, or Canine Influenza.  This portion of the limited warranty affords the consumer little to no actual protection from these diseases and infirmities for at least two reasons:  (i) the warranty is contingent upon an initial veterinarian visit with a veterinarian designated by Petland within days of purchase, but prior to the gestational period for many of these illnesses; and (ii) the coverage is limited to the purchase price of the puppy leaving the consumer to pay all expenses above and beyond that price.

91.  The limited warranty also warrants the puppy against "hereditary and congenital disorders."  This warranty offers consumers no protection against these common defects in puppy mill puppies for at least three reasons:  (i) coverage is limited by an ambiguous condition precedent in that the disorder must "interfere with the puppy's ability to lead a normal life;" (ii) unlike the other coverage terms, the time period for this coverage is triggered by the puppy's birth rather than its purchase date knowing that many of these hereditary and congenital disorders do not manifest themselves until the warranty period has expired; and (iii) the relief afforded under this limited warranty coverage is a credit toward another puppy mill puppy to start this vicious cycle all over again rather than a monetary refund.

92.  Petland similarly misrepresents the health of these puppies by claiming that they are all "checked by at least two and in most cases three veterinarians" before they are sold.  http://www.petland.com/AboutPetland/HealthyPets.htm  (last viewed September 11, 2009).  While in some cases this statement may not be patently false, it is at best a half-truth that, when viewed with Petland's scheme as a whole, materially misleads consumers into believing that these veterinary checks guarantee healthy pets.  And as evidenced by the hundreds of complaints about sick dogs purchased from Petland, if

each of these dogs were in fact checked by a veterinarian, the checks clearly do not ensure that Petland is selling healthy puppies

93.  Although providing little actual protection, the Petland warranty serves to further the fiction that it is selling puppies from "professional and hobby breeders who have years of experience in raising quality family pets" that are the "the finest available," instead of unhealthy puppies from some of the most notorious puppy mills in the United States.

**E.    The Humane Society of the United States' Investigation Confirms Petland's Rampant Use of Puppy Mills**

94.  The Humane Society of the United States ("The HSUS"), the country's largest animal protection organization, has been working for decades to combat the cruelty associated with puppy mills.  The HSUS has successfully exposed puppy mill operations, and the retailers that support them, by conducting investigations into these secretive and lucrative businesses.

95.  The HSUS recently conducted two such investigations into Petland's operations and it continues to gather information which confirms Petland's practice of buying puppies from puppy mills or brokers of puppy mill puppies, such as Hunte.  These investigations, along with the over 800 complaints sent to The HSUS by aggrieved Petland consumers, show that Petland stores across the country mislead consumers into purchasing puppy mill puppies by falsely promising that the puppies the stores sell are healthy and come from reputable and responsible breeders.

96.  Spanning a total timeframe of 14 months, The HSUS collected and reviewed records relating to the shipment of over 32,000 puppies to Petland stores throughout the country.  These records are predominantly available to the public though they are generally only attainable for a fee or at no cost if an individual appears in person at the government agency where the records are kept.

97.   The results of the The HSUS's first investigation were released to the public in November, 2008.  In that investigation, The HSUS investigators personally visited 21 Petland retail locations and 35 breeders and brokers who sold puppies to Petland.  The HSUS investigators also reviewed USDA inspection reports and state import records from an additional 322 breeders and about 17,000 individual puppies linked to Petland.

98.   In nearly every store visited by The HSUS investigators, Petland employees specifically mentioned the USDA in their sales pitch, using phrases such as: "USDA approved," "USDA licensed" or "USDA certified" breeders.  For instance, an employee in a corporate-owned Petland store in Columbus, Ohio, when referring to a USDA licensed kennel from which the store obtains puppies, stated that the USDA "make[s] sure that it's not a puppy farm."  This is false, as USDA regulations only set out the bare minimum standards of care required by law but do not prohibit breeders from placing profits before the welfare of the puppies, and certainly do not prohibit mass breeding in confinement situations common to puppy mills.  Similarly, an employee in a Nevada Petland attempted to tell The HSUS investigator about the USDA's involvement, but instead, after stating that all of the puppies for sale come from the Hunte Corp., stated that all of the dogs for sale are "UCDA Approved…um, United States.. Dog…it's a dog company that approves breeders."  Similarly, an employee at an Indiana Petland claimed that Petland's breeders "get checked out twice a year to make sure they're doing everything alright.  And if they don't do everything all right they get shut down and we can't buy from them."  Once again this is false.  In fact, numerous puppy mill operators are repeat-violators of the Animal Welfare Act and USDA regulations, and yet are continuously re-licensed by the USDA.

99.   Petland employees also referred to the USDA in conjunction with Petland's "Humane Care Guidelines," which one Petland employee in a Florida store described to The HSUS investigator as a "47-page list of things that our breeders have to go through…so we can get our dogs from there."  Moreover, Petland's corporate communications have repeatedly described these guidelines as being developed "with

33

the USDA" or "in conjunction with the USDA," but the USDA's response to a Freedom of Information Act request sent to USDA by The HSUS reveals that USDA has no record of developing any such guidelines with Petland.

100. Petland employees in numerous stores also specifically stated that Petland does not associate with puppy mills. For example, a North Carolina Petland store displays a sign which reads, "[this store] does not support puppy mills." In a Florida Petland store, a Petland employee told The HSUS investigator that the puppies are "not supposed to be from puppy mills" and that Petland has "people that go out and inspect the grounds like where they're from and the facilities." Speaking to the owner of an Ohio Petland store, the investigator asked, "But they're not… like… from puppy mills?" The Petland owner shook his head vigorously from side-to-side and replied, "They're… no…no…no…no. No."

101. However, The HSUS investigators personally visited some of the puppy mills that supply Petland stores with puppies where they witnessed and documented the deplorable conditions present in these mills. The investigators observed and, when possible, video-recorded puppies living in filthy, barren cages reeking of urine. The dogs clearly received inadequate care and little or no socialization.

102. Moreover, a review of USDA inspection reports from more than 100 Petland breeders revealed that, in more than 60% of the inspections, serious violations of basic animal care standards were found including the following:

a. Coleen Styck, Styck Kennels, Ellington, MO: received violations for sick animals and filthy conditions, inadequate housing, and more. Many of the violations were not corrected between inspections. For instance, inspectors observed at least 12 dogs "with extensive matting along the back and hind quarters" with "organic matter encrusted in the hair and matts." This violation was a repeat violation and the conditions were not corrected between inspections.

b. Kathy & Allan Bauck, Pick of the Litter Kennel, New York Mills, MN:  received violations for expired medicine, for severely sick and injured dogs, for filthy conditions, and more.  The facility also received a violation when the USDA inspector observed dogs fighting inside their cages.

c. Mike & Melanie Moore, MAM Kennel, Lamar, MO:  received violations for inadequate housing, expired medication, filthy conditions, and more.  Also received a violation for failing to have the attending veterinarian examine or treat 209 dogs for nearly two years.

d. Connie & Jimmy Jr. West, West Kennel, Strang, OK: received a violation in 2005 for allowing contaminated water to flow from hog pens into dog pens.  USDA inspectors were unable to gain entry to re-inspect the breeding facility for over three years.

103. Nevertheless, the USDA allowed these and other unsafe and disreputable facilities to continue operating, and Petland continued to purchase puppies from them.

104. The HSUS's investigations also confirmed that many of the Petland puppies were obtained through large scale pet distributors–brokers such as Hunte–who in turn obtained puppies from puppy mills.  Indeed, in several stores visited by HSUS investigators, Hunte was specifically referenced, and was sometimes referred to as a type of gate-keeper that ensures Petland stores only receive healthy puppies.  In a Florida Petland store, an employee told The HSUS investigator that a representative from Hunte traveled to the store to speak with Petland employees in training about the purported high quality of Hunte's facilities.  The employee told The HSUS investigator that the puppies for sale in the store first go to Hunte to get "their checks" and then travel on a truck, accompanied by a veterinarian, in a 72.5 regulated degree atmosphere.

105. However, as The HSUS's investigation revealed, many of the brokers used by Petland, including Hunte, have been cited by USDA for violations of even the most basic Animal Welfare Act standards, including the following:

a. Hunte Corporation, Goodman, MO: received violations for scores of puppies found cramped in small runs without the minimal amount of floor space required by law. Also repeatedly received violations for transporting underage puppies. After 73 puppies died in a fire aboard a Hunte truck during transport, the company was cited for unsafe conveyance due to inoperable brakes.

b. Lambriar, Inc., Mahaska, KS: received violations for failing to provide adequate veterinary care after sick puppies which were rejected by a pet store were not provided medical treatment. Also cited for violations related to a failure to ensure that puppies were able to eat adequate food during transport.

c. Brian Morhfiend, Perfect Puppies, West Point, IA: received violations for filthy and unsafe conditions including housing young puppies outdoors, for no pest control which resulted in mouse feces present where food was stored and because "a majority of the primary housing units and empty housing units had a build up of feces, hair, dirt and grime that had not been cleaned out for a period of time." The USDA later cited this broker for purchasing approximately 516 animals in 2008 from unlicensed breeders.

106. In June, 2009, The HSUS released the results of a subsequent investigation. The HSUS again reviewed selected health certificate/transport documents in more than 10 states covering more than 15,000 individual puppies shipped to Petland stores in 30 different states (constituting approximately 95% of Petland's domestic locations).

107. This follow-up investigation reaffirms the findings from the initial investigation and shows that Petland stores continue to buy from puppy mills and puppy mill brokers—many of which were previously named and exposed by The HSUS in 2008.

108. Indeed, Petland stores were again documented buying puppies from the facility of Kathy & Allan Bauck, in New York Mills, MN. This puppy mill was identified as a Petland supplier in the HSUS's 2008 investigation, and Petland stores continued to acquire puppies from the facility even though Kathy Bauck was convicted of three

counts of animal torture and one count of animal cruelty in March, 2009. Indeed, Bauck had previously served 10 days in jail after pleading guilty in 2008 to practicing veterinary medicine without a license.

109. The USDA inspection reports of breeders linked to Petland reviewed during the follow-up investigation again showed serious violations of the most basic animal care standards, including the following:

  a. Lisa Copeland, Drury, MO: received violations for failing to document and maintain records for 32% of the dogs at the facility. The breeder was also cited for keeping dogs in enclosures with broken wires that have sharp points and that do not protect dogs from rain or wind.

  b. Tammy & Terry Lansdown, Landsown Kennel, Seymour, MO: received violations for filthy and unsafe conditions in a "whelping building" where puppies are born, including a leaking drainage system where "flies were collecting around the leaking fecal soup."

  c. Allene Taylor, Taylors Kennels, Washburn, MO: received violations for failing to provide adequate housing when dogs were found housed outdoors, without heat or any type of bedding material, when the temperature reached as low as 42 degrees. Also cited for failing to provide adequate veterinary care because the "attending veterinarian" had not examined any of the breeder's dogs in over a year.

  d. Mary Ann Smith, Smiths Kennel, Salem, MO: received violations for inadequate and unsafe housing because of a lack of sufficient heat and bedding in below freezing temperatures and for sharp, pointed wires in dogs' primary enclosures. Also cited for failing to provide adequate veterinary care to 21 dogs including 15 with matted fur, three with "green matter in their eyes," one with "cherry eye," five suffering some form of "hair loss" and one with "bright red blood" in its feces.

110. In addition to scouring through thousands of pages of interstate transport documents, The HSUS also gathered information about Petland's practices from ongoing litigation related to Petland, as well as from other sources. These sources are a crucial, though limited, supplement to The HSUS investigations due to the fact that most of the thousands of health/transport records that HSUS investigators reviewed only relate to the interstate transport of puppies which originated in certain states. Thus, Petland stores purchasing puppies from in-state puppy mills were not necessarily documented in these interstate records and any stores that purchased from unlicensed breeders would not have left a "public records paper trail." Nevertheless, these other sources of information provided yet additional confirmation of Petland's inextricable relationship with sub-standard breeding facilities.

111. For example, according to its own court filings, an Ohio Petland store procured puppies from several different puppy mills including the following:

    a.    Atlee Raber, Stone Hill Kennel, Millersburg, OH: received violations for filthy and unsafe conditions including five puppies in cages with open wire bottoms. The USDA inspector noted that 12 of 20 of the puppies' legs were hanging through the bottom of the cage.

    b.    Mose Troyer, Jr., Millersburg, OH: after USDA inspectors were unable to inspect the facility for over a year, received violations for unsafe and unsanitary housing because a majority of the dogs' enclosures had "an excessive accumulation of rust."

    c.    Paul Yoder, Stony Hills Kennel, Millersburg, OH: received violations for unsafe and unsanitary conditions and for failing to provide adequate veterinary care to a dog that had "excessive matting around her face." Also cited for repeat violations of having expired medications.

    d.    Bert Miller, Shreve, OH: received violations for filthy, unsanitary conditions including "feeders" that had not been cleaned in over six weeks, housing enclosures with "excessive amounts of rust" and for "whelping boxes"

that have "ground in organic material." Also cited for failing to provide adequate veterinary care to a dog with "excessively matted fur" as well as for having expired medications.

112. In short, The HSUS investigations demonstrate that Petland acquires its puppies from facilities that are anything but "the finest available" and who "have years of experience in raising quality family pets." On the contrary, the investigations confirm beyond doubt that Petland routinely obtains puppies from puppy mills that place profit far above the welfare of the dogs. The result is that Petland customers routinely receive poorly bred and poorly treated puppies who suffer from an array of illnesses and hereditary defects—as the over 800 complaints received by The HSUS from aggrieved Petland customers demonstrate.

## V. CLASS ACTION ALLEGATIONS

113. This action is brought by Plaintiffs as a class action pursuant to Fed. R. Civ. P. 23, and for all claims asserted herein, on behalf of themselves and the following class:

> All persons who purchased a puppy from a Petland retail store since November 20, 2004. Excluded from the class are any defendants, their respective parents, employees, subsidiaries and affiliates, and all government entities.

114. The class is believed to include tens of thousands of consumers who purchased puppy mill puppies from Petland retail locations across the nation.

115. The proposed class is so numerous and geographically dispersed that the individual joinder of each would be impracticable. The exact number of members is unknown at this time but can be ascertained readily from the records of Defendants, or their agents.

116. This matter presents common questions of law and fact arising out of the sale of the puppy mill puppies at Petland stores. These common questions predominate over any individual questions applicable to members of the proposed class. Among the numerous questions of law and fact common to the proposed class are:

39

a. whether Defendants embarked upon a scheme to defraud consumers by concealing and/or misrepresenting that the puppies being sold at Petland retail locations were not from puppy mills;

b. whether Defendants' sales and marketing practices and representations made in connection with puppies sold at Petland locations in the United States were unlawful under RICO and/or violated the consumer protection statutes asserted herein;

c. whether Defendants conspired to execute the scheme to defraud consumers alleged herein; and

d. whether Plaintiffs and members of the class suffered an injury as a result of Defendants' illegal conduct.

117. <u>Fed. R. Civ. P. 23(a)(3) and (4): Typicality and Adequacy</u>. Plaintiffs' claims are typical of the proposed class. Plaintiffs' puppies were purchased from Petland and whelped at a puppy mill. The origin of Plaintiffs' puppies was intentionally misrepresented to them. Plaintiffs and all members of the class sustained damages arising out of the Defendants' common course of conduct as complained of herein. The amount of money at issue is such that proceeding by way of class action is the only economical and sensible manner in which to vindicate the injuries sustained by Plaintiffs and members of the class.

118. Plaintiffs will fairly and adequately protect the interests of class members. Plaintiffs have retained qualified and experienced counsel in class action litigation, and counsel has no adverse interest. Plaintiffs understand the nature of the claims herein, have no disqualifying interest and will vigorously represent the class. Plaintiffs, by agreement with their counsel, have the resources necessary to prosecute the case fully and completely.

119. <u>Fed. R. Civ. P. 23(b)(2)</u>: A class action is appropriate because Defendant has acted, and/or failed to act, on grounds generally applicable to the representative Plaintiffs

and the class, thereby making appropriate final injunctive relief and or declaratory relief with respect to the class.

120. Fed. R. Civ. P. 23(b)(3):  A class action is appropriate because, as set forth *supra*, the common questions of law or fact predominate over any questions affecting individual members of the class, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

121. There are no unusual legal or factual issues which would cause management problems not normally and routinely handled in class actions.  Petland's scheme to defraud consumers across the country was a uniform course of action created and adopted at its corporate headquarters and implemented at its stores throughout the country.  Damages may be calculated with mathematical precision.

122. Further, a class action is an appropriate method for the fair and efficient adjudication of this controversy, because there is no special interest in the members of the class controlling the prosecution of separate actions.  Absent a class action, most members of the class would likely find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law.  Absent a class action, class members will continue to suffer harm and Defendants' misconduct will proceed without remedy.  The class treatment of common questions of law or fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

## COUNT I

## VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)

123. Plaintiffs restate and reallege, and incorporate herein by reference, the preceding paragraphs as though fully set forth herein.

124. Section 1962(c) of RICO prohibits "any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

**A.    Petland Enterprise**

125. For purposes of this claim, the RICO "Enterprise" is an association-in-fact consisting of Petland, its franchisees and approved sellers, including Defendant Hunte. Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of the Petland Enterprise ("Enterprise") through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

126. Upon information and belief, the Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are, and have been associated for the common or shared purpose of executing the Petland scheme to defraud consumers into buying puppy mill puppies and buying them at grossly inflated prices. Each of the participants in the Enterprise was aware of the common plan of promoting the puppies as being bred at a breeder that was not a puppy mill and each received substantial revenue from the scheme to promote and sell puppy mill puppies. The demand for the puppy mill puppies and the revenue Defendants received from the sale of such puppies was many times greater than it would have been if the puppies were disclosed as being whelped at puppy mills.

127. The Enterprise is an ongoing organization that serves a vehicle to carry out the Petland scheme. Members of the Enterprise are associated through contractual relationships, financial ties, and the continuing coordination of activities between members. Members also share a common communication network through which they share information on a regular basis.

128. The Enterprise functions as a continuing unit. Each of the members continues to play their respective roles in the scheme and each benefit from the activities of the other members in furtherance of the scheme. Petland is able to market its franchise business in

large part on the profitability of puppy sales. Petland franchisees are required to purchase puppies from those sellers approved by Petland. The approved sellers have an outlet for the sales of their inhumanely bred puppies, while Petland and its franchisees sell puppy mill puppies to an unsuspecting public at premium prices.

**B.     Affect on Interstate Commerce**

129. The Enterprise engages in and affects interstate commerce because defendants marketed, transported and sold tens of thousands of puppies throughout the United States.

**C.     Defendants' Association with the Enterprise**

130. At all relevant times, each of the Defendants was aware of the scheme to defraud Plaintiffs and members of the class and was a knowing and willing participant in the scheme, and reaped profits as a result of its participation.

131. Upon information and belief, Petland devised the scheme and directed the operation of the Enterprise in carrying out the scheme to sell puppy mill puppies to customers without their knowledge and to sell them at grossly inflated prices.

132. Upon information and belief, Hunte was aware of and participated in Petland's scheme to defraud Plaintiffs and the class. It supplies puppy mill puppies to Petland stores and participates in the false representation that the puppies are healthy having been bred by reputable breeders who adhered to safe and humane breeding practices.

**D.     Defendants Participated in the Conduct of the Enterprise**

133. Each defendant had some part in directing the affairs of the Enterprise. Petland controls and manages the affairs of the Enterprise. Through its franchise agreements Petland binds its franchisees to its authorized sellers and directs its employees and its franchisees to pass off puppies bred in puppy mills as healthy, humanely-bred puppies and to sell them at an inflated price.

43

134. Upon information and belief, Hunte distributed large numbers of puppies bred under unsafe and inhumane conditions and has falsely represented the conditions of their birth. Hunte knowingly participated in the fraudulent scheme to pass puppy-mill dogs off as humanely-bred dogs, which in turn allowed Petland to charge inflated prices for the dogs.

**E.    Pattern of Racketeering**

135. To carry out their fraudulent scheme each Defendant has conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. These acts have occurred for more than four years and are continuing today. They are not isolated or sporadic acts but are part of a continuing operation to defraud consumers about the health and welfare of the puppies sold at Petland stores.

136. Defendants' racketeering activities have amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and members of the class. Each separate use of the U.S. mails or interstate wire facilities employed by Defendants was related, had similar intended purposes, involved similar participations and methods of execution, and was conducted for the same purpose of defrauding consumers about the nature and value of Petland's puppies.

**1.    Formation of a scheme or artifice to defraud**

137. Defendant's fraudulent scheme consisted of, *inter alia*: misrepresenting that the puppies sold at Petland retail stores across the nation to Plaintiffs and the Class were "healthy," "the finest available," and by deliberately misrepresenting puppy mills who bred the dogs as "professional and hobby breeders who have years of experience in raising quality family pets," and by deliberately misrepresenting that the puppies were from USDA-licensed breeders, thereby misrepresenting the true origin and value of the dogs sold at Petland.

### 2. Use of interstate communications in furtherance of the scheme

138. During the class period, Defendants' illegal conduct and wrongful practices were carried out by an array of agents and/or employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information and funds by the U.S. mails and interstate wire facilities.

139. Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding acts of mail and wire fraud) have been deliberately hidden and cannot be alleged without access to the Defendants' books and records. Indeed, an essential part of the successful operation of the scheme depended on secrecy, and the Defendants withheld details of the scheme from the Plaintiffs and members of the class. Generally, however, Plaintiffs can describe the occasions on which the predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme. They include thousands of communications to perpetuate and maintain the scheme throughout the class period, including, *inter alia*: (i) national advertising programs distributed by Petland to its retail locations marketing materials and advertisements about the franchise opportunities of Petland across the country; (ii) the exchange of operational information and financial statements between each Petland franchisee and Petland in Ohio; (iii) communications, including financial payments, between Petland, its franchisees and the puppy mills or puppy brokers who have been, or seek to be, approved by Petland to sell puppies at Petland and to Petland franchisees; and (iv) receiving the proceeds of the improper scheme.

140. These uses of the U.S. mail or interstate wire facilities are closely related to the fraudulent scheme because they facilitated the fraudulent sale of puppy mill puppies to Plaintiffs and the class.

### 3. Defendants specifically intended to deceive Plaintiffs and the class about the origin and value of the Petland Puppies

141. Upon information and belief, the scheme was devised and intentionally crafted to ensure that Plaintiffs and members of the class would unknowingly purchase puppies

45

bred under unsafe and inhumane conditions and pay inflated prices to Petland and Petland-supported puppy mill operations.

142. By intentionally and fraudulently misrepresenting the true origin of the puppies and the conditions under which they were bred, Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

**F.     Injury to Plaintiffs and the Class**

143. Plaintiffs and members of the class have been injured in their property by reason of these violations in that collectively they have paid millions of dollars into this fraudulent market that they would not have paid had Defendants not engaged in their pattern of racketeering activity.  As a direct result of Defendants' fraudulent scheme Plaintiffs and the class unwittingly purchased puppy mill dogs and paid a premium price for them.  Additionally, Plaintiffs and class members incurred consequential costs, including veterinarian bills arising from medical conditions commonly associated with puppy mill breeding conditions.

144. Under Section 1964(c) of RICO, Defendants are liable to Plaintiffs and members of the class for three times the damages that Plaintiffs and the class have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**COUNT II**

**VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)**

145. Plaintiffs restate and reallege, and incorporate herein by reference, the preceding paragraphs as though fully set forth herein.

146. Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

147. Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).  The object of this conspiracy has been and is to conduct or participate in,

directly or indirectly, the conduct of the affairs of the Petland Enterprise through a pattern of racketeering activity, as previously described.

**A.     Defendants Knew of and Agreed to the Petland Scheme**

148. Upon information and belief, Defendants each knowingly agreed to facilitate a scheme, which includes the operation or management of the previously described Petland Enterprise in furtherance of its goal of defrauding Plaintiffs and the class by making false representations about the origin and value of Petland's puppy mill dogs.

149. That Petland was aware of the essential nature and scope of the Enterprise and intended to participate in it can be inferred *inter alia*: by its selection of puppy mills or puppy mill brokers, such as Defendant Hunte, as its supplier of dogs; its misrepresentations of the origin and quality of its dogs; its oversight of its franchisees' representations and sales of Petland dogs; and from the fact that the bulk of the emails, faxes, and phone calls that are at issue in this lawsuit are believed to have originated from Petland's headquarters.

150. Hunte knowingly facilitated the Petland scheme by supplying unhealthy puppies from puppy mill to Petland for sale to Plaintiffs and the Class.  Hunte's involvement in the scheme became evident during The HSUS's investigation of Petland.  As part of its investigation, The HSUS reviewed inspection reports and license renewal applications for Petland breeders and brokers identified through its examination of approximately 30,000 health certificates filed by Petland breeders or brokers in the last two years. These reports indicate that many of the breeders and brokers (including Hunte) have been repeatedly cited for violations of the Animal Welfare Act.

151. Hunte represents supports the scheme alleged misrepresenting the health of the puppies they sell to Petland on their website: Hunte has established a "comprehensive musculoskeletal criteria for accepting puppies from breeders by creating various grades for knees, hips, heart murmurs, and other health conditions" (*See* http://www.thehuntecorporation.com/industryfirsts.html (last visited September 10,

47

2009)); "Hunte puppies are the happiest, healthiest puppies on the planet" (*See* http://www.huntecorp.com/virtual_tour_english_128k.wmv (last viewed September 11, 2009)).

152. Contrary to Hunte's representations, some Plaintiffs and members of the Class purchased Petland puppies provided by Hunte with the health problems it purports to screen and which likely could have been avoided if the breeders had engaged in safe, sanitary and humane breeding practices.

153. Hunte also furthered the deceptive scheme by representing that its puppies are from "the most reputable breeders," and that it is dedicated to providing "the absolute best care possible to every single puppy no matter what it costs." *See* http://www.thehuntecorporation.com/puppycare.html (last visited September 10, 2009). "Hunte works only with the most reputable USDA licensed breeders in the country who in turn, abide by the most stringent federal and state legislative breeding standards and practices currently enforced." *See* http://www.huntecorp.com/virtual_tour_english_128k.wmv (last viewed September 11, 2009). This is also false and shown to be so by The HSUS's investigation.

154. Hunte's knowledge of the nature and scope of the Enterprise and agreement to participate in it can be inferred from its distribution of puppy mill puppies and its supportive false statements concerning those puppies' health and welfare.

**B.    Defendants furthered or facilitated the criminal endeavor of the Petland Enterprise**

155. Defendants each took steps to further or facilitate the criminal endeavor of the Petland Enterprise by agreeing to commit or participating in the Enterprise's previously described pattern of racketeering activity.

156. Petland facilitated or furthered the criminal endeavor of the Petland Enterprise *inter alia*: by creating and ratifying the scheme at its corporate headquarters; by selecting the breeders and dog suppliers to its Petland franchisees; by overseeing the franchisees

48

and requiring them to sell dogs, which included dogs bred under unsafe and inhumane conditions; and by engaging in misrepresentations about the dogs sold at Petland and their breeders.

157. Hunte facilitated or furthered the criminal endeavor of the Petland Enterprise *inter alia*: by distributing puppy mill puppies and by supporting Petland's false representations about the quality of the dogs Hunte provided and the conditions under which they were bred.

**C. Injury to Plaintiffs and the Class**

158. Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs and the class of money.

159. Plaintiffs and members of the class have been injured in their property by reason of these violations in that they have paid millions of dollars into this fraudulent market that they would not have paid had Defendants not engaged in their pattern of racketeering activity. As a direct result of Defendants' fraudulent scheme Plaintiffs and the class unwittingly purchased puppy mill dogs and paid a premium price for them. Additionally, Plaintiffs and class members incurred consequential costs, including veterinarian bills arising from medical conditions commonly associated with puppy mill breeding conditions.

160. Defendants are each liable for their own acts and the acts of their co-conspirators in furtherance of the scheme. By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiffs and members of the class for three times the damages Plaintiffs and members of the class have sustained, plus the cost of this suit, including reasonable attorney's fees.

# COUNT III

## VIOLATION OF MULTI-STATE CONSUMER PROTECTION LAWS

161. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

162. Plaintiffs and the members of the class are consumers that purchased puppies from Petland for personal, family, or household purposes.

163. Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the marketing and sale of these puppies to Plaintiffs and the proposed class members.

164. Defendants violated this duty by misrepresenting the health, origin, characteristics, and quality of the puppies being sold by Petland.

165. Plaintiffs and members of the class were directly and proximately injured by Defendants' conduct and would not have purchased these puppy mill puppies, and incurred the expenses in caring for these puppies, had Defendants not engaged in its fraudulent scheme.

166. Defendants' misrepresentations and/or material omissions to Plaintiffs and the proposed class members were and are unfair and deceptive acts and practices.

167. Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiffs and the proposed class members.

168. Plaintiffs and the class members were deceived by Defendants' misrepresentations and/or omissions.

169. As a proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and the proposed class members have suffered an ascertainable loss and are entitled to relief, in an amount to be determined at trial.

170. Specifically, Defendants engaged in unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed below:

(1)     Defendants engaged in various deceptive, unfair, and unconscionable trade practices likely to mislead Plaintiffs and the Class in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44 1522, et seq.;

> a.     Defendants violated the Arizona Consumer Fraud Act by deceiving consumers regarding the nature and origin of the dogs they purchased, including as set forth above;
>
> b.     Defendants violated the Arizona Consumer Fraud Act by concealing, suppressing or omitting the material fact that dogs sold to their customers were bred in puppy mills.  This concealment was an essential component of selling dogs to Plaintiffs and the Class as no Plaintiff and no Class Member would knowingly purchase a dog bred in a puppy mill;
>
> c.     Defendants intended that consumers rely on the various misrepresentations and material omissions regarding the conditions under which the dogs they sell were bred and raised, including as set forth above;
>
> d.     Defendants' false promises and misrepresentations regarding the origin of the dogs they sold, including as set forth above, caused Plaintiffs to purchase dogs they otherwise would not have purchased.
>
> e.     As a result of Defendants' deceptive, unfair, and unconscionable acts and trade practices, Plaintiffs and the Class incurred veterinary and animal hospital expenses to treat their puppies for illnesses and conditions that in fact made the puppies unfit for sale when Defendants sold the puppies to Plaintiffs and the Class

f.      Defendants have refused to refund the purchase price for the defective puppies sold for premium prices by Defendants to the Plaintiffs and the Class.

g.      Plaintiffs and the Class have suffered money damages in the form of veterinarian expenses and lost money.

(2)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of California's Unfair Competition Law ("UCL") Cal. Bus. & Prof. Code § 17200, and the California Consumer's Legal Remedies Act (CLRA) Cal. Civ. Code § 1760, et seq.;

a.      The UCL is intended to proscribe unfair or fraudulent business acts or practices.

b.      The CLRA is intended to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection. The purpose of the CLRA is to alleviate the social and economic problems that arise from deceptive business practices.

c.      Defendants have engaged in unfair, unlawful, deceptive and fraudulent business acts and practices, including as set forth above.

d.      By engaging in the above-described acts and practices, Defendants have committed one or more acts of unfair competition within the meaning of the UCL and the CLRA.

e.      Defendants' acts and practices have and/or are likely to deceive members of the consuming public.

f.      As a result of Defendants' acts of unfair competition, Plaintiffs and each member of the Class have suffered injury in fact by paying money to purchase dogs from Defendants that they would not have purchased had Defendants not misrepresented and omitted material information about the nature and origins of those dogs.

g.     Plaintiffs, on behalf of themselves and on behalf of each member of the Class, seek individual restitution, injunctive relief and other relief allowed under the UCL and the CLRA.

(3)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),  Fla. Stat. § 501.201, et seq.;

a.     As described above, commencing on a date unknown, but at least subsequent to November 20, 2004, and extending beyond that date, Defendants engaged in various deceptive, unfair, and unconscionable trade practices likely to mislead Plaintiffs and the Class in violation of FDUTPA.

b.     Section 501.204(1) of FDUTPA makes illegal "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  § 501.204(1), Fla. Stat. (2007).

c.     Section 501.203(3)(c) of FDUTPA forbids violation of "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition or unfair, deceptive, or unconscionable acts or practices".

d.     Defendants' above-described violations are actionable violations of FDUTPA.

e.     Specifically, Defendants' unfair and deceptive acts and practices uniformly deceived Plaintiffs and the Class into believing that they were purchasing puppies from a select group of reputable breeders, when they were actually purchasing puppies from disreputable and unsanitary puppy mills.

f.     Defendants' deceptive, unfair, and unconscionable trade practices offend the established public policy of the State of Florida

and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and the Class.

g.     Plaintiffs and the Class have been actually aggrieved by Defendants' deceptive, unfair, and unconscionable acts and trade practices.

h.     Defendants' deceptive, unfair, and unconscionable acts and trade practices caused and induced Plaintiffs and the Class to purchase sick and/or genetically defective puppies from Defendants.

i.     As a result of Defendants' deceptive, unfair, and unconscionable acts and trade practices, Plaintiffs and the Class incurred veterinary and animal hospital expenses to treat their puppies for illnesses and conditions that in fact made the puppies unfit for sale when Defendants sold the puppies to Plaintiffs and the Class.

j.     Defendants have refused to refund the purchase price for the defective puppies sold for premium prices by Defendants to the Plaintiffs and the Class.

k.     Plaintiffs and the Class have suffered money damages in the form of veterinarian expenses and lost money.

(4)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFDBPA"), 815 ILCS § 501/1, et seq.;

a.     The ICFDBPA is intended to protect consumers against fraud and unfair or deceptive acts or practices in the conduct of any trade or commerce.

b.     Defendants committed deceptive acts, including as alleged above, with the intent that Plaintiffs and the Class rely on the deception.

54

c. The deception was made in the course of conduct involving trade or commerce, specifically the sale of dogs to Plaintiffs and the Class.

d. Plaintiffs and the Class have been actually aggrieved by Defendants' deceptive, unfair, and unconscionable acts and trade practices.

e. Defendants' deceptive, unfair, and unconscionable acts and trade practices caused and induced Plaintiffs and the Class to purchase sick and/or genetically defective puppies from Defendants.

f. As a result of Defendants' deceptive, unfair, and unconscionable acts and trade practices, Plaintiffs and the Class incurred veterinary and animal hospital expenses to treat their puppies for illnesses and conditions that in fact made the puppies unfit for sale when Defendants sold the puppies to Plaintiffs and the Class.

(5) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Indiana Deceptive Consumer Sales Act ("IDCSA"), Ind. Code Ann. § 24-5-0.5-1, et seq.

a. The IDCSA was enacted for the purposes of improving the law on deceptive and unconscionable sales practices, protecting consumers, and encouraging the development of fair consumer sales practices.

b. The IDCSA prohibits a seller from falsely representing that the subject of a consumer transaction has certain characteristics when the seller knows or reasonably should know that it does not have those characteristics. Defendants violated the IDCSA by falsely representing the nature and origin of the dogs they sold, including as set forth above.

c.     The IDCSA prohibits a seller from falsely representing that the subject of a consumer transaction meets a particular standard, or is of a certain quality, when the seller knows or reasonably should know that it does not meet that standard and is not of a certain quality.  Defendants violated the IDCSA by misleading their consumers into believing that the dogs they sold did not come from puppy mills, when they did.

d.     The IDCSA prohibits a seller from falsely representing that the subject of a consumer transaction involves or does not involve a warranty, a disclaimer of warranties, or other rights, remedies, or obligations, when the seller knows or reasonably should know that the representations are false.  Defendants violated the IDCSA by issuing a so-called "warranty" that in fact provides no protection for the consumer, as set forth above.

e.     Defendants' actions, including as described above, constitute incurable deceptive acts, insofar as the deceptive acts were committed as part of a scheme, artifice or device with the intent to defraud or mislead Plaintiffs and the Class.

f.     Defendants' deceptive, unfair, and unconscionable acts and trade practices caused and induced Plaintiffs and the Class to purchase sick and/or genetically defective puppies from Defendants.

g.     As a result of Defendants' deceptive, unfair, and unconscionable acts and trade practices, Plaintiffs and the Class incurred veterinary and animal hospital expenses to treat their puppies for illnesses and conditions that in fact made the puppies unfit for sale when Defendants sold the puppies to Plaintiffs and the Class

h.  Plaintiffs and the Class have suffered money damages in the form of veterinarian expenses and lost money.

(6)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Maine Unfair Trade Practices Act ("MUTPA"), 5 MRSA § 205-A, et seq.;

a.  Maine forbids unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

b.  Plaintiffs and the Class purchased dogs primarily for personal, family or household purposes.

c.  As described above, Plaintiffs and the Class suffered loss of money as the result of Defendants' use or employment of unfair and deceptive acts in selling dogs bred in deplorable conditions at puppy mills, while concealing those critical facts from the Plaintiffs and the Class.

d.  Plaintiffs and the Class were harmed because of Defendants' deceptive practices, specifically by incurring veterinary expenses and losing the money spent on purchasing their dogs from Defendants.

e.  The Defendants have profited as a result of being able to sell puppy mill dogs that no Plaintiff and no member of the Class would have purchased but for the Defendants' acts of deception.

(7)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Michigan Consumer Protection Act ("MICPA") Mich. Comp. Laws § 445.901, et seq.;

a.  The MICPA makes unlawful unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce.

b.  The MICPA serves a remedial purpose and is given a liberal construction in order to achieve its goals, which are to protect

57

consumers in their purchases of goods used for personal, family or household purposes.

c.      The MICPA prohibits sellers from causing a probability of confusion or misunderstanding as to the source of goods they are selling. Defendants violated the MICPA by deliberately and knowingly confusing Plaintiffs and the Class concerning the origin of the dogs they sold.

d.      The MICPA prohibits sellers from representing that goods or services are of a particular standard, quality, or grade, when they are not. Defendants misrepresented that the dogs they sold were of the highest standard, when in fact they were not.

e.      The MICPA prohibits sellers from failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer. The MICPA further prohibits sellers from failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner. As a result of Defendants' elaborate scheme, including as described above, Defendants concealed the origin and nature of the dogs they sold to Plaintiffs and the Class with the intent of misleading Plaintiffs and the Class. Plaintiffs and the Class could not reasonably have determined that the dogs sold by Defendants were actually bred and weaned in puppy mills.

f.      Defendants' deceptive, unfair, and unconscionable acts and trade practices caused and induced Plaintiffs and the Class to purchase sick, inferior, and/or genetically defective puppies from Defendants.

g.      As a result of Defendants' deceptive, unfair, and unconscionable acts and trade practices, Plaintiffs and the Class

incurred veterinary and animal hospital expenses to treat their puppies for illnesses and conditions that in fact made the puppies unfit for sale when Defendants sold the puppies to Plaintiffs and the Class.

h.     Plaintiffs and the Class have suffered money damages in the form of veterinarian expenses and lost money.

(7)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Minnesota Prevention of Consumer Fraud Act ("MNCFA"), Minn. Stat. § 325F.67, et seq.;

a.     The MNCFA reflects the Minnesota legislature's intent to make it easier to sue for consumer fraud than it had been to sue for fraud at common law.  One of the central purposes of the MNCFA is to address the unequal bargaining power that is often found in consumer transactions.

b.     Defendants have engaged in unfair, unlawful, deceptive and fraudulent business acts and practices, including as set forth above.

c.     By engaging in the above-described acts and practices, Defendants have committed one or more acts of deception that constitute a violation of the MNCFA.

d.     Defendants' acts and practices have deceived Plaintiffs and the Class.

e.     As a result of Defendants' acts of unfair competition, Plaintiffs and the Class have suffered injury in fact by paying money to purchase dogs from Defendants that they would not have purchased had Defendants not misrepresented and omitted material information about the nature and origins of those dogs.

f. Plaintiffs, on behalf of themselves and on behalf of each member of the Class, seek individual restitution, injunctive relief and other relief allowed under the MNCFA.

(8) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Missouri Merchandising Practices Act ("MMPA"), VAMS § 407.010, et seq.;

a. The purpose of the MMPA is to preserve fundamental honesty, fair play and right dealings in public transactions.

b. Defendants have engaged in unconscionable, unfair, unlawful, deceptive and fraudulent business acts and practices, including as set forth above.

c. By engaging in the above-described unfair acts and practices, Defendants have committed one or more acts of deception that constitute a violation of the MMPA.

d. Defendants' acts and practices have deceived Plaintiffs and the Class.

e. As a result of Defendants' acts of unfair competition, Plaintiffs and the Class have suffered injury in fact by paying money to purchase dogs from Defendants that they would not have purchased had Defendants not misrepresented and omitted material information about the nature and origins of those dogs.

f. Plaintiffs, on behalf of themselves and on behalf of each member of the Class, seek individual restitution, injunctive relief and other relief allowed under the MMPA.

(9) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Nebraska Consumer Protection Act ("NCPA"), Neb. Rev. Stat. § 59-1601, et seq.;

a. The NCPA makes unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. The purpose of the NCPA is to provide consumers with protection against unlawful practices in the conduct of any trade or commerce.

b. Defendants' deceptive acts, including as described above, create consumer confusion in the marketplace by falsely marketing puppy mill dogs as the finest available.

c. By engaging in the above-described unfair acts and practices, Defendants have committed one or more acts of deception that constitute a violation of the NCPA.

d. Defendants' acts and practices have deceived Plaintiffs and the Class, and have harmed the public interest.

e. As a result of Defendants' deceptive acts, Plaintiffs and the Class have suffered injury in fact by paying money to purchase dogs from Defendants that they would not have purchased had Defendants not misrepresented and omitted material information about the nature and origins of those dogs.

f. Plaintiffs, on behalf of themselves and on behalf of each member of the Class, seek individual restitution, injunctive relief and other relief allowed under the NCPA.

(10) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act ("NDTPA"), Nev. Rev. Stat. § 598.0903, et seq.;

a. The purposes of the NDTPA are to prohibit acts that restrain trade or commerce, protect and preserve the free market, and penalize all persons engaged in anticompetitive practices to the full extent of the law.

b.      Defendants violated the NDTPA by deceiving consumers regarding the nature and origin of the dogs they purchased, including as set forth above;

c.      Defendants violated the NDTPA by concealing, suppressing or omitting the material fact that dogs sold to their customers were bred in puppy mills.  This concealment was an essential component of selling dogs to Plaintiffs and the Class as no Plaintiff and no Class Member would knowingly purchase a dog bred in a puppy mill;

d.      Defendants intended that consumers rely on the various misrepresentations and material omissions regarding the conditions under which the dogs they sell were bred and raised, including as set forth above;

e.      Defendants' false promises and misrepresentations regarding the origin of the dogs they sold, including as set forth above, caused Plaintiffs to purchase dogs they otherwise would not have purchased.

f.      As a result of Defendants' deceptive, unfair, and unconscionable acts and trade practices, Plaintiffs and the Class incurred veterinary and animal hospital expenses to treat their puppies for illnesses and conditions that in fact made the puppies unfit for sale when Defendants sold the puppies to Plaintiffs and the Class.

g.      Plaintiffs and the Class have suffered money damages in the form of veterinarian expenses and lost money.

(11)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act ("NHCPA") N.H. Rev. Stat. § 358 A:1, et seq.;

a.      The NHCPA prohibits any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or

commerce. The purpose of the NHCPA is to ensure an equitable relationship between consumers and persons engaged in business.

      b.     Defendants engaged in unethical and unscrupulous conduct including by engaging in the deceptive conduct set forth above.

      c.     Defendants' conduct was deceptive insofar as it caused Plaintiffs and the Class to purchase dogs that they otherwise would not have purchased.

      d.     Defendants' acts caused substantial injury to the Plaintiffs and the Class, including as set forth above.

(12)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the New Mexico Unfair Practices Act ("NMUPA"), N.M. Stat. Ann. § 57-12-1, et seq.;

      a.     The NMUPA makes it unlawful to make a false or misleading oral or written statement, or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services which may tend to deceive or mislead any person. The NMUPA is intended to provide a private remedy for individuals who suffer pecuniary harm for conduct involving misleading identification of goods.

      b.     Defendants' above-described violations are actionable violations of NMUPA.

      c.     Specifically, Defendants knowingly engaged in the unfair and deceptive acts and practices, and such acts uniformly deceived Plaintiffs and the Class into believing that they were purchasing puppies from a select group of reputable breeders, when Plaintiffs and the Class were actually purchasing puppies from disreputable and unsanitary puppy mills.

d.      Defendants' deceptive, unfair, and unconscionable trade

practices are immoral, unethical, oppressive, unscrupulous, and

substantially injurious to Plaintiffs and the Class.

e.      Plaintiffs and the Class have been actually aggrieved by

Defendants' deceptive, unfair, and unconscionable acts and trade

practices.

f.      Defendants' deceptive, unfair, and unconscionable acts and

trade practices caused and induced Plaintiffs and the Class to

purchase sick and/or genetically defective puppies from Defendants.

g.      As a result of Defendants' deceptive, unfair, and

unconscionable acts and trade practices, Plaintiffs and the Class

incurred veterinary and animal hospital expenses to treat their

puppies for illnesses and conditions that in fact made the puppies

unfit for sale when Defendants sold the puppies to Plaintiffs and the

Class.

h.      Defendants have refused to refund the purchase price for the

defective puppies sold for premium prices by Defendants to the

Plaintiffs and the Class.

i.      Plaintiffs and the Class have suffered money damages in the

form of veterinarian expenses and lost money.

(13)    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of the New York Consumer Protection Act ("NYCPA"), N.Y.

Gen. Bus. Law § 349, et seq.;

a.      The NYCPA prohibits deceptive acts or practices in the

conduct of any business, trade or commerce.  The NYCPA was

enacted to provide consumers with a means of redress for injuries

caused by unlawfully deceptive acts and practices.  The statute is

intentionally broad as the statute seeks to secure an honest marketplace where trust and not deception prevails.

      b.     Defendants have engaged in deceptive acts, including as set forth above.

      c.     Defendants' acts were directed at Plaintiffs and the Class, and those acts have deceived members of the consuming public.

      d.     As a result of Defendants' material misrepresentations concerning the origin and nature of the dogs sold, Plaintiffs and each member of the Class have suffered injury in fact by paying money to purchase dogs from Defendants that they would not have purchased had Defendants not misrepresented and omitted material information about the nature and origins of those dogs.

      e.     Plaintiffs, on behalf of themselves and on behalf of each member of the Class, seek individual restitution, injunctive relief and other relief allowed under the NYCPA.

    (14)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina's Unfair and Deceptive Trade Practices Act ("NCUTPA"), N.C. Gen. Stat. § 75-1.1, et seq.;

      a.     The NCUTPA prohibits unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce.  The primary purpose of the NCUTPA is to protect the public consumers by giving a private cause of action to consumers injured by unfair or deceptive acts.  The fundamental purpose of the statute is to protect the consumer.

      b.     Defendants have engaged in unfair and deceptive acts and practices, including as set forth above.

      c.     Defendants' acts and practices affected commerce and were directed at Plaintiffs and the Class, and those acts and practices

possessed the tendency and capacity to mislead members of the consuming public, including as set forth above.

d.     As a result of Defendants' material misrepresentations concerning the origin and nature of the dogs sold, Plaintiffs and each member of the Class have suffered injury in fact by paying money to purchase dogs from Defendants that they would not have purchased had Defendants not misrepresented and omitted material information about the nature and origins of those dogs.

(15)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. § 201 1, et seq.;

a.     The UTPCPL prohibits certain acts that are deemed to be unfair or deceptive with regards to the conduct of any trade or commerce. The purpose of the statute is to protect the public and to eradicate unfair and deceptive business practices.

b.     At all times relevant hereto, Defendants were engaged in trade or commerce.

c.     The Plaintiffs and the Class purchased dogs for personal, family or household purposes.

d.     Defendants' actions constitute a violation of Section 201-2(4)(v). They represented that their dogs had characteristics or qualities that they did not have, including as set forth above.

e.     Defendants' conduct constituted the making of a knowingly false misrepresentation of facts.

f.     Defendants intentionally concealed facts which were calculated to deceive the Plaintiffs and the Class.

g.     Defendants intended their representations and actions to induce action and reliance by the Plaintiffs and the Class.

h.     The Plaintiffs and the Class justifiably relied upon

Defendants' misrepresentations.

i.      The Plaintiffs and the Class have suffered an ascertainable

loss in the form of significant damages, including as set forth above,

as a result of the aforesaid methods, acts and practices of Defendants.

(16)     Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of the South Carolina Unfair Trade Practices Act ("SCUTPA")

S.C. Code Ann. § 39-5-10, et seq.;

a.     The SCUTPA makes it unlawful to engage in unfair methods

of competition and unfair or deceptive acts or practices in the conduct

of any trade or commerce.  Under the SCUTPA, an act is unfair when

it is offensive to public policy or when it is immoral, unethical, or

oppressive; a practice is deceptive when it has a tendency to deceive.

b.     Defendants' deceptive acts, including as described above,

create consumer confusion in the marketplace by falsely marketing

puppy mill dogs as the finest available.

c.     By engaging in the above-described unfair acts and practices,

Defendants have committed one or more acts of deception that

constitute a violation of the SCUTPA.

d.     Defendants' acts and practices have deceived Plaintiffs, and

have harmed the public interest.

e.     As a result of Defendants' deceptive acts, Plaintiffs suffered

actual ascertainable losses in fact by paying money to purchase dogs

from Defendants that they would not have purchased had Defendants

not misrepresented and omitted material information about the nature

and origins of those dogs.

f.     Plaintiffs, on behalf of themselves, seek individual restitution,

injunctive relief and other relief allowed under the SCUTPA.

(17)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code § 47 18 101, et seq.;

    a.    The TCPA was enacted to promote various policies, including, protecting consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of an trade or commerce in part or wholly within this state, and providing for civil legal means for maintaining ethical standards of dealing between persons engaged in business and the consuming public to the end that good faith dealings between buyers and sellers at all levels of commerce.

    b.    Defendants have engaged in unfair and deceptive acts and practices, including as set forth above.

    c.    Defendants representing that the dogs sold to the Plaintiffs were of the "finest available" standard or quality for dogs, when those dogs did not meet such a standard, insofar as they were bred and weaned at puppy mills. Defendants committed unfair or deceptive acts or practices under the TCPA.

    d.    The Defendants' deceptive conduct misled consumers through Defendants' statements, silence, and actions, including as set forth above.

    e.    As a direct and proximate result of Defendants' material misrepresentations concerning the origin and nature of the dogs sold, Plaintiffs suffered injury in fact by paying money to purchase dogs from Defendants that they would not have purchased had Defendants not misrepresented and omitted material information about the nature and origins of those dogs.

f.      Plaintiffs, on behalf of themselves, seek individual restitution, injunctive relief and other relief allowed under the TCPA.

(18)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Texas Deceptive Trade Practices Act ("TDTPA"), Tex. Bus. Com. Code § 17.41, et seq.;

a.      The TDTPA was enacted to protect consumers against false, misleading, and deceptive business practices, unconscionable actions and breaches of warranty and to provide efficient and economical procedures to secure such protection.

b.      Defendants' above-described violations are actionable violations of TDTPA.

c.      Specifically, Defendants knowingly engaged in false, misleading and deceptive acts and practices, and such acts uniformly deceived Plaintiffs and the Class into believing that they were purchasing puppies from a select group of reputable breeders, when Plaintiffs and the Class were actually purchasing puppies from disreputable and unsanitary puppy mills.

d.      Defendants' deceptive, unfair, and unconscionable trade practices are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and the Class.

e.      Plaintiffs and the Class have been actually aggrieved by Defendants' deceptive, unfair, and unconscionable acts and trade practices.

f.      Defendants' deceptive, unfair, and unconscionable acts and trade practices served as the producing cause of the injuries to the Plaintiffs and the Class, who were induced to purchase sick and/or genetically defective puppies from Defendants.

g.      As a result of Defendants' deceptive, unfair, and unconscionable acts and trade practices, Plaintiffs and the Class incurred veterinary and animal hospital expenses to treat their puppies for illnesses and conditions that in fact made the puppies unfit for sale when Defendants sold the puppies to Plaintiffs and the Class.

h.      Defendants have refused to refund the purchase price for the defective puppies sold for premium prices by Defendants to the Plaintiffs and the Class.

i.      Plaintiffs and the Class have suffered money damages in the form of veterinarian expenses and lost money.

(19)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code § 19.86.010, et seq.;

a.      The WCPA prohibits unfair methods of competition and unfair deceptive acts of practices in the conduct of any trade or commerce.  The WCPA creates a private cause of action and its stated purpose is to protect citizens from unfair and deceptive trade and commercial practices.

b.      Defendants' deceptive acts, including as described above, create consumer confusion in the marketplace by falsely marketing puppy mill dogs as the finest available.

c.      By engaging in the above-described unfair acts and practices, Defendants have committed one or more acts of deception that constitute a violation of the WCPA.

d.      Defendants' acts and practices have deceived Plaintiffs and the Class, and have harmed the public interest.

e.      As a result of Defendants' deceptive acts, Plaintiffs and the Class have suffered injury in fact by paying money to purchase dogs from Defendants that they would not have purchased had Defendants not misrepresented and omitted material information about the nature and origins of those dogs.

f.      Plaintiffs, on behalf of themselves and on behalf of each member of the Class, seek individual restitution, injunctive relief and other relief allowed under the WCPA.

(20)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act ("WVCPA"), West Va. Code § 46A-6-101, et seq.;

a.      The WVCPA makes unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.  The Act is intended to protect consumers who purchase goods or services on credit or through consumer loans from deceptive selling techniques, and protect consumers from unfair deceptive selling practices.

b.      Defendants' above-described violations are actionable violations of WVCPA.

c.      Specifically, Defendants knowingly engaged in false, misleading and deceptive acts and practices, and such acts uniformly deceived Plaintiffs and the Class into believing that they were purchasing puppies from a select group of reputable breeders, when Plaintiffs and the Class were actually purchasing puppies from disreputable and unsanitary puppy mills.

d.      Defendants' deceptive, unfair, and unconscionable trade practices are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and the Class.

e. Plaintiffs and the Class have been actually aggrieved by Defendants' deceptive, unfair, and unconscionable acts and trade practices.

f. Defendants' deceptive, unfair, and unconscionable acts and trade practices served as the producing cause of the injuries to the Plaintiffs and the Class, who were induced to purchase sick and/or genetically defective puppies from Defendants.

g. As a result of Defendants' deceptive, unfair, and unconscionable acts and trade practices, Plaintiffs and the Class incurred veterinary and animal hospital expenses to treat their puppies for illnesses and conditions that in fact made the puppies unfit for sale when Defendants sold the puppies to Plaintiffs and the Class.

h. Defendants have refused to refund the purchase price for the defective puppies sold for premium prices by Defendants to the Plaintiffs and the Class.

i. Plaintiffs and the Class have suffered money damages in the form of veterinarian expenses and lost money.

171. Plaintiffs and members of the class were injured by Defendants' conduct because Plaintiffs and members of the class would not have paid for, or would have paid substantially less, for puppies from Petland. Plaintiffs and class members are entitled to damages, restitution, disgorgement, and/or such orders or judgments as may be necessary to restore to any person in interest, any money which may have been acquired by means of such unfair practices and to the relief set forth below.

**COUNT IV**

**UNJUST ENRICHMENT**

172. Plaintiffs restate and reallege, and incorporate herein by reference, the preceding paragraphs as though fully set forth herein.

173. As the intended and expected result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from their scheme to defraud purchasers of puppies from Petland.

174. Defendants have voluntarily accepted and retained these profits and benefits, derived from Plaintiffs and members of the class, with full knowledge and awareness that, as a result of their deception, Plaintiffs and the members of class paid substantial monies and benefits to Defendants to which Defendants were not lawfully entitled.

175. Defendants have been unjustly enriched at the expense of the Plaintiffs and the class members, who are entitled to in equity, and hereby seek, the disgorgement and restitution of Defendants' wrongful profits, wrongful commissions, revenue and benefits to the extent, and in the amount, deemed appropriate by the Court, as well as such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

**COUNT V**

**VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT, R.C. § 1345, *et seq.***

176. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege as follows:

177. Defendants are suppliers subject to and governed by Ohio Consumer Sales Practices Act ("OCSPA"), R.C. § 1345.01 *et seq.*

178. The Plaintiffs and members of the Class are all consumers as defined by R. C. § 1345(D).

179. The knowing acts and practices complained of herein by Plaintiffs, individually and on behalf of the Class, constitute unfair, deceptive or unconscionable sales practices in violation of R.C. § 1345 *et seq*.

180. The acts and practices of Defendants include all aspects of the scheme to defraud consumers by manufacturing a fraudulent market for puppy mill puppies by concealing or misrepresenting that the puppies being purchased were whelped at a puppy mill.

181. As a direct result of the deceptive practices of the Defendants, Plaintiffs and the members of Class suffered damage and seek a declaration that Defendants' conduct as alleged herein constitutes unfair, deceptive or unconscionable sales practices in violation of R.C. § 1345 *et seq*.

## TOLLING OF STATUTE OF LIMITATIONS

182. Plaintiffs restate and reallege, and incorporate herein by reference, the preceding paragraphs as though fully set forth herein.

183. Petland and Hunte's conduct was and is, by its nature, self-concealing. Petland, Hunte and their co-conspirators, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and have actively foreclosed Plaintiffs and the class from learning of their illegal, unfair and/or deceptive acts.

184. By reason of the foregoing, the claims of Plaintiffs and the classes and subclass are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.   An order certifying this action as a class action, appointing Plaintiffs as Class Representatives and designating Plaintiffs' counsel as Class Counsel;

B.  Defendants' scheme to defraud consumers in their purchase of Petland puppies constitutes the predicate acts for RICO of mail fraud and wire fraud;

C.  A judgment awarding Plaintiffs and each member of the class a full refund of all monies paid for their puppies, along with consequential damages resulting from Defendants fraudulent conduct, interest thereon and any amount by which Defendants have been unjustly enriched, plus treble damages, and any additional relief to which they may be entitled under state consumer protection laws as set forth in Count IV;

D.  An order awarding Plaintiffs and the class their costs of suit, including reasonable attorneys' fees and expenses as provided by law;

E.  A declaratory judgment that Defendants' conduct constitutes unfair, deceptive or unconscionable sales practices in violation of R.C. § 1345, *et seq*.; and

F.  An award of such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, or proper by the Court.

## JURY DEMAND

Plaintiffs request that all issues herein shall be tried to a jury.


RESPECTFULLY SUBMITTED this 11th day of September, 2009.


**HAGENS BERMAN SOBOL SHAPIRO LLP**

By  s/ Robert B. Carey
    Robert B.  Carey, #011186
2425 East Camelback Road, Suite 650
Phoenix, Arizona 85016

Steve W.  Berman, WSBA #12536
Anthony Shapiro, WSBA #12824
Barbara Mahoney, WSBA #31845
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101

Simon Bahne Paris
Patrick Howard
**SALTZ, MONGELUZZI, BARRETT
& BENDESKY, P. C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel (215) 575-3986
Fax (215) 575-3894
E-mail: sparis@smbb.com
E-mail: phoward@smbb.com

**Garen Meguerian**
21 Industrial Boulevard, Suite 201
Paoli, PA 19301
Tel: (610) 590-2176
Fax: (480) 247-5804
E-mail: gm@garenmlaw.com

Attorneys for Plaintiffs

**Of Counsel:**

Kimberly Ockene
Aaron D. Green
The Humane Society of the United States
2100 L Street, NW
Washington, DC 20037
E-mail: kockene@hsus.org
E-mail: agreen@hsus.org