**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JoDell Martinelli, et al.,<br><br>                    Plaintiffs,<br><br>vs.<br><br>Petland, Inc.; and The Hunte Corporation,<br><br>                    Defendants. | No. CV-09-529-PHX-DGC<br><br>**ORDER** |

Plaintiffs have filed a motion for class certification pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Docs. 129 (sealed), 137 (redacted). The motion is fully briefed. Docs. 152, 162, 164, 166. Oral argument was heard on April 7, 2011. For reasons stated below, the Court will deny the motion.

**I.     Background.**

Petland, Inc. is a large retailer of pets. Through company-owned stores and franchisees, Petland sells puppies at more than 100 locations throughout the United States. The puppies are supplied directly by individual breeders and through various brokers.

In March 2009, six purchasers of Petland puppies filed this action against Petland and one of its suppliers, The Hunte Corporation. Plaintiffs claimed that they bought Petland puppies with the understanding that they were bred under safe and humane conditions by a reputable breeder, but the puppies actually were bred at "puppy mills."

A puppy mill, according to Plaintiffs, is a dog breeding operation in which the health of the dogs is disregarded in order to maintain a low overhead and maximize profits. Plaintiffs alleged that their puppies were sick at the time of purchase or became ill shortly thereafter. The complaint asserted claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, predicated on alleged violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 (counts one and two), claims for violations of consumer protection laws from many states (counts three and five), and a claim for unjust enrichment (count four). Doc. 1.

On August 7, 2009, the Court granted Defendants' motions to dismiss because the complaint failed adequately to plead fraud and causation. Doc. 49. An amended complaint filed one month later asserted the same claims as the original complaint, but added 25 new plaintiffs. Doc. 54. In an order dated January 26, 2010, the Court dismissed the claims of all but two plaintiffs, Elliot Moskow and Karen Galatis, on the ground that only those individuals sufficiently alleged damages proximately caused by Petland. Doc. 68. The Hunte Corporation was dismissed because it did not supply the puppies purchased by Moskow and Galatis. *Id.* at 10.

The claims that remain in this case are (1) Plaintiffs Moskow and Galatis' count-one RICO claim, (2) Plaintiffs Moskow and Galatis' unjust enrichment claim based on fraud, and (3) Plaintiff Moskow's claim under the Maine Unfair Trade Practices Act. Doc. 68 at 17. These are the claims for which Plaintiffs seek class certification.

**II.    Rule 23 Requirements.**

Plaintiffs bear the burden of showing that the four Rule 23(a) requirements are met and, under Rule 23(b)(3), that questions of law or fact common to all class members predominate over issues affecting only individual members. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). This Court must "rigorously analyze" the proposed class to ensure that it comports with the requirements of Rule 23. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). This analysis often will "require looking

behind the pleadings, even to issues overlapping with the merits of the underlying claims." *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 581 (9th Cir. 2010). "*Falcon*'s central command requires district courts to ensure that Rule 23 requirements are actually met, not simply presumed from the pleadings." *Id.* at 582.

Plaintiffs seek certification of a class defined as all persons who purchased a puppy from a Petland store since November 20, 2004, supplied by a Class B licensee who acquired the puppy from a breeder not previously inspected by Petland. Class certification should be denied, Petland argues, because the class definition is overbroad, common questions do not predominate over individual issues, and the need for individual trials makes the class unmanageable. Because the proposed class clearly fails the predominance requirement of Rule 23(b)(3), the Court need not address Petland's other challenges to class certification.

### III. Causation.

The RICO statute makes it unlawful for any person associated with an enterprise to participate in the conduct of such enterprise's affairs through a pattern of racketeering. 18 U.S.C. § 1962(c). The alleged pattern of racketeering in this case is mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. Doc. 54 ¶ 135. To plead a violation of those statutes, Plaintiffs must allege that Defendants formed a scheme to defraud, used the United States mails and wires in furtherance of that scheme, and did so with the specific intent to defraud. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400-01 (9th Cir. 1986). Plaintiffs also must allege facts showing that the fraudulent scheme proximately caused Plaintiffs' injuries. *See Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004).

Plaintiffs' motion for class certification addresses only their RICO claim. *See* Doc. 129. Plaintiffs agree that the claim requires proof of proximate cause. *Id*. at 13-19.[1]

---

[1] Although Plaintiffs do not address their other claims, those claims also require proof of proximate cause. Maine's Unfair Trade Practices Act grants a private remedy to any person who purchases goods or services through an unfair trade practice and suffers

- 3 -

The Court previously found that this is a case where proof of reliance is "'a mile post on the road to causation.'"  Doc. 49 at 7 (quoting *Poulos*, 379 F.3d at 664).  Stated differently, "individualized reliance issues related to [P]laintiffs' knowledge, motivations, and expectations bear heavily on the causation analysis."  *Poulos*, 379 F.3d at 665.  The "complete absence of reliance [will] prevent [Plaintiffs] from establishing proximate cause."  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658-59 (2008).

Plaintiffs do not dispute that reliance constitutes a component of causation in this case; they do not contend that causation can be established by some other means.  Plaintiffs argue instead that reliance can be established by both first-party and third-party reliance, and that common questions will predominate over individual questions for both types of reliance if the class is certified.

### A. First-Party Reliance.

First-party reliance, as used by the parties in this motion, refers to direct reliance by the class members on Petland's allegedly false representations.  Plaintiffs argue that such reliance can be established by showing that Petland engaged in a pervasive, centrally-orchestrated scheme to misrepresent the quality of puppies sold at its stores.  This scheme, according to the amended complaint, included "misrepresenting that the puppies sold at Petland retail stores across the nation to Plaintiffs and the Class were 'healthy,' 'the finest available,' and by deliberately misrepresenting puppy mills who bred the dogs as 'professional and hobby breeders who have years of experience in raising quality family pets,' and by deliberately misrepresenting that the puppies were from USDA-licensed breeders, thereby misrepresenting the true origin and value of the

---

loss "as a result" of the unfair practice.  5 MRSA § 213(1).  A claim under the Maine statute therefore requires proof of proximate cause.  *See Millett v. Atl. Richfield Co.*, No. Civ.A. CV-98-555, 2000 WL 359979, at *13 (Me. Super. Ct. Mar. 2, 2000) ("to prevail on their claims for . . . violation of the Unfair Trade Practices Act, plaintiffs must prove a causal link between [their injury] and defendants' misrepresentations and omissions").  Plaintiffs' unjust enrichment claim asserts that Petland has "profited and benefited from their scheme to defraud purchasers of puppies from Petland."  Doc. 54 ¶ 173.  Because it is predicated on fraud, Plaintiffs must establish the proximate cause required for fraud.  *See* Docs. 49 at 9, 68 at 15-16.

dogs sold at Petland." Doc. 54 ¶ 137.  Petland's misrepresentations purportedly were made through Petland's "uniform standards for selling puppies through a written health certificate and/or warranty provided at the time of sale" (*id.* ¶ 3) and in statements made on Petland's website and in written brochures "mailed and/or provided to consumer[s] in its retail locations" (*id.* ¶¶ 5, 64, 71-72, 92).

The Court previously dismissed the claims of all but two of the named Plaintiffs because the amended complaint contained no allegation that they relied on a written health certificated or warranty, visited Petland's website, read Petland's brochures, or heard and relied on oral representations by Petland sales personnel. Doc. 68 at 3-8. The claims brought by Moskow and Galatis survived dismissal because it reasonably could be inferred that they relied on specific oral representations about the origin and health of Petland puppies. Doc. 68 at 9.  A Petland representative is alleged to have assured Moskow that Petland puppies did not come from puppy mills (Doc. 54 ¶ 31), while a Petland employee purportedly assured Galatis, among other things, that her puppy was healthy and had never been sick (*id.* ¶ 33). *See* Docs. 132-11 at 11, 132-14 at 19.

Plaintiffs now essentially argue that the Court should assume all class members relied on Petland's fraudulent scheme because it was pervasive. Doc. 129 at 18 ("This common evidence, coupled with Plaintiffs' allegations that class members would not have purchased puppies at a premium price had they known that PLI's representations were false, establishes proximate causation at the certification stage."). And yet a class member who never heard the allegedly fraudulent sales pitch, never visited Petland's website, and never read its written materials could not be said to have relied on the false statements in those communications.  If a class member did not rely on the alleged fraudulent scheme, that class member cannot prove that the scheme caused his or her purchase and his or her injury.

Plaintiffs submit declarations of eight potential class members asserting that they received and relied on oral representations (Docs. 133-6 through 133-13), but the very

fact that Plaintiffs must turn to individual class members to muster this proof demonstrates that the evidence of reliance is necessarily individual – each class member must be shown to have received and relied on Petland's alleged misrepresentations. The Court simply cannot assume that all class members, who purchased puppies over a six or seven year period at some 100 different stores, heard and relied on Petland's alleged misstatements. Indeed, Plaintiffs previously failed to allege that 29 of the 31 named Plaintiffs relied upon any such communications, even after being put on notice by the Court that such reliance would be necessary to sustain their claims. Doc. 68 at 4-5. If the class were certified, a purchaser-by-purchaser inquiry would be necessary to prove causation. Individual issues would predominate.

As the Court noted in a prior order, class members may have purchased puppies from Petland for a variety of reasons. A person might buy a puppy because he falls in love with it in the store window, he has heard it will make a good guard dog, he likes the price, he is referred to the store by a friend, or he finds the store convenient. It is not necessarily true that every purchaser would read or hear the allegedly false statements, or even that he or she would base a purchase decision on the fact that the puppy was "the finest available" or was bred by professional, hobby, or USDA-approved breeders – key misrepresentations identified in the amended complaint. Doc. 54 ¶¶ 5, 137. Nor is it necessarily true that every puppy purchaser would rely on representations concerning the dog's health. Although rational people generally would not pay hundreds of dollars for a sick puppy, a person who falls in love with a puppy in the store window might well purchase the puppy in the absence of any representation concerning its health. However unwise, some people might even buy a sick puppy in order to provide it a good home and nurse it back to health.

Because the Court and a jury could not simply assume that every class member relied on Petland's alleged representations in making his or her purchase decision, individual proof of reliance would be necessary. Each class member would need to prove

that he or she received and relied on communications made as part of the RICO fraudulent scheme in order to prove that the scheme proximately caused his or her loss. Individual issues would predominate.

Plaintiffs rely heavily on *In re American Continental Corp.*, 140 F.R.D. 425 (D. Ariz. 1992) ("*ACC*"), to support their argument that class-wide reliance can be proved by evidence of a pervasive fraudulent scheme. But *ACC* was a securities fraud case that relied on the fraud-on-the-market theory to establish a "presumption of reliance." *Id*. at 429. This is not a securities fraud case and Plaintiffs have not asserted a fraud-on-the-market theory. Although *ACC* also relied on the "centrally orchestrated" fraud perpetrated by Lincoln Savings and American Continental Corporation, it noted that purchasers of the securities were "consistently informed" of the fraudulent representations. *Id*. at 430; *see also In re First Alliance Mortg. Co.*, 471 F.3d 977, 991 (9th Cir. 2006) (noting that *ACC* "involved a scheme that included, among other things, the sale of debentures to individual investors *who relied on oral representations of bond salespersons* who in turn had received from defendants fraudulent information about the value of the bonds" (emphasis added)).

Such class-wide reliance could be accepted in *ACC* because of the unique facts of that case. Purchasers of the bonds in *ACC* were customers of Lincoln Savings and Loan who entered a Lincoln branch to conduct banking business. Once in the savings and loan, class members were confronted by sales people selling bonds in American Continental, a Lincoln affiliate. As the evidence recited at length in Judge Bilby's order makes clear, these class members were persuaded by the sales people that the enormous size and resources of American Continental made the bonds a very safe investment. *ACC*, 140 F.R.D. at 437-40. The class members succumbed to the sales pitch and purchased the bonds, which later turned out to be worthless. There was no disputing that class members in *ACC* were persuaded by the sales pitches to buy the bonds. The *ACC* defendants instead argued that individual issues would predominate because the sales

pitches were not uniform – that individual inquiries concerning the pitches would be necessary.  Judge Bilby disagreed, finding that "[t]he exact wording of the oral misrepresentations . . . is not the predominant issue" because the oral sales pitches, which were heard and relied on by every class member, "were sufficiently uniform to warrant class treatment." *Id*. at 431, 430.

Class members in this case are not like the bond purchasers in *ACC*.  The *ACC* purchasers entered a savings and loan to do banking business – to deposit money, make a withdrawal, or take out a loan.  While there, they were persuaded by oral sales pitches to do something different – buy bonds in *ACC*.  Class members in this case, by contrast, entered pet stores to see possible pets.  They were not, like the *ACC* class members, diverted from one endeavor (banking) to another (buying corporate bonds) by a persuasive sales pitch.  Although it may be true that some class members in this case were persuaded to buy a puppy by the sales pitch of a Petland employee, it simply cannot be said that all of them were.  Indeed, as already noted, the vast majority of the named Plaintiffs in this case could *not* allege that they relied on any sales pitch or written material when they purchased their dog.  Thus, to show that the alleged fraudulent scheme caused their losses, class member in this case would be required to show that they heard and relied on the scheme's misrepresentations.  Such reliance was universally true in *ACC*.  In this case it would require purchaser-by-purchaser proof.

Plaintiffs also rely heavily on *In re First Alliance Mortgage Company*, 471 F.3d 977 (9th Cir. 2006), but this case also concerned a centrally-orchestrated scheme of oral sales representations that induced class members to act – to accept detrimental mortgage loans.  The parties in *First Alliance* did not dispute that class members received the oral sales pitch.  The defendant instead argued that class members should not have relied on the pitch because it was contrary to the fine print in the loan documents they signed.  *Id*. at 992 ("Lehman also attempts to undermine the class-wide fraud determination by focusing on the reliance element, arguing that the borrowers could not have justifiably

relied upon oral misrepresentations when they signed documents that contradicted those oral statements."). The Ninth Circuit rejected this argument, noting that the entire scheme "was built on inducing borrowers to sign documents without really understanding them." *Id.* As in *ACC*, all class members received and relied on the oral sales pitch.

Plaintiffs' reliance on *Negrete v. Allianz Life Insurance Company of North America*, 238 F.R.D. 482 (C.D. Cal. 2006), fares no better. Each class member in *Negrete* had read and understood the defendant's alleged misrepresentations regarding the value of deferred annuities, and it reasonably could be assumed that no rational class member would have purchased the annuities had he or she known the truth about the product's actual value. *Id.* at 492.

In summary, Plaintiffs rely on cases where the class members admittedly received and relied on fraudulent materials when making their purchase decisions. Plaintiffs' own failure to allege that 29 of the 31 named Plaintiffs received and relied on fraudulent materials in this case distinguishes it from *ACC*, *First Alliance*, and *Negrete*. Because individual inquiries concerning each class member's reliance on the allegedly fraudulent scheme would be necessary, individual issues would predominate over common issues and class treatment is not appropriate under a first-party reliance theory.[2]

### B. Third-Party Reliance.

"[C]ourts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation." *Bridge*, 553 U.S. at 656 (citations omitted). Plaintiffs allege that Petland uniformly misrepresents to its franchisees that Petland inspects and approves all breeders who supply puppies to the franchisees and would never support puppy mills, and that Petland puppies are healthy and the finest available.

---

[2] Plaintiffs argue that because it would be illogical to purchase a sick puppy absent a representation as to its health, first-party reliance may be inferred through a "common sense" link between Petland's alleged misrepresentations and the class members' actions. The Court rejected this argument in a previous order. Doc. 68 at 6-7.

Reliance on these misrepresentations by franchisees, Plaintiffs contend, constitutes third-party reliance sufficient under *Bridge* to establish proximate cause without individual issues predominating. The Court disagrees for several reasons.

First, although Plaintiffs assert in their motion that franchisees relied on Petland's alleged scheme to defraud (Doc. 137 at 14), the amended complaint disavows any such reliance. The complaint affirmatively alleges that franchisees are part of the RICO enterprise (Doc. 54 ¶ 125), that they are aware of the "plan of promoting the puppies as being bred at a breeder that was not a puppy mill" (*id.* ¶ 126), and that "Petland *and its franchisees* sell puppy mill puppies to an unsuspecting public at premium prices" (*id.* ¶ 128) (emphasis added). If the franchisees are complicit in Petland's fraud as the amended complaint alleges, they cannot be said to rely on that fraud and thereby satisfy the reliance requirement of causation. Moreover, as the Supreme Court noted in *Bridge*, such knowledge and culpability by the third party "would constitute an intervening cause breaking the chain of causation between [Petland's] misrepresentations and [Plaintiffs'] injury." *Bridge*, 553 U.S. at 658-59.

Second, even if Plaintiffs were permitted to assert reliance on the part of the franchisees, reliance would need to be determined on a franchisee-by-franchisee basis. Again, the evidence Plaintiffs present demonstrates the individualized nature of the reliance inquiry. *See* Docs. 130-7 (former franchisee's declaration), 131-14 through 132-4 (declarations of former Petland employees). Petland has also presented evidence showing that a franchisee's purchasing decision is based on a host of factors other than what Petland allegedly represents, including the availability, selection, and cost of the puppies, the relationship with and proximity to the supplier, the supplier's history of providing healthy puppies, the warranty provided by the supplier, discussions with other franchisees, and the franchisee's own independent inspections. Doc. 152-5 at 10-21. Contrary to Plaintiffs' assertion, third-party reliance may not be determined on a class-wide basis.

Plaintiffs' reliance on *Friedman v. 24 Hour Fitness USA*, No. CV 06-6282 AHM (CTx), 2009 WL 2711956 (C.D. Cal. Aug. 25, 2009), is misplaced. Causation in that case was premised on two electronic payment processors' reliance on the defendant's representation in its written payment instructions that charges were valid and authorized. 2009 WL 2711956, at *9. Given the uniform and consistent manner in which the representation was made, the defendant did not dispute that reliance on the part of the payment processors could be proven on a class-wide basis. *Id.* This case, by contrast, involves scores of franchisees in locations throughout the country with varying business experience and practices. The Court cannot assume that each of them obtained puppies from suppliers for the same reason – because of Petland's alleged misrepresentations.

Third, the Supreme Court explained in *Bridge* that third-party reliance can satisfy the causation requirement of RICO only if there is "'some direct relation between the injury asserted and the injurious conduct alleged.'" 553 U.S. at 654 (quoting *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268 (1992)). The Supreme Court characterized this "direct relation" requirement as a "demand" warranting "particular emphasis." *Id*. The Court explained:

> The direct-relation requirement avoids the difficulties associated with attempting to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors; prevents courts from having to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries; and recognizes the fact that directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Id*. (citations and quotation marks omitted).

The direct relation requirement clearly was met in *Bridge*. The defendant misrepresented to the county that it was using a single source to bid on tax liens when in fact it was using several. Reliance on this misrepresentation by the county permitted the defendant to procure more tax liens than the plaintiff, who was bidding only through a

single source. The defendant's false statement to the county was directly related to the plaintiff's loss. *Id*. at 658.

Plaintiffs in this case have not shown that they could establish such a direct relation on a class-wide basis. As already noted, class members may have purchased puppies for a variety of reasons unrelated to any fraud Petland allegedly perpetrated on its franchisees. Moreover, Plaintiffs seek to recover damages for veterinary costs incurred when their puppies became sick. Doc. 164 at 13. The source of the puppies' sicknesses, however, could not be shown to bear a "direct relation" to Petland's fraud on franchisees. Some puppies might have become sick for reasons entirely unrelated to the allegation that Petland failed to inspect a breeding facility. They may have been healthy when they left the breeder and become sick due to exposure in the franchisee's store or exposure that occurred after they were purchased. Trying to determine the cause of the sickness for each class member's puppy would present the very problem the "direct relation" demand is designed to avoid – "difficulties associated with attempting to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Id*. Stated differently, third-party reliance would be available under *Bridge* only if all of the class members' damages could be attributed directly to Petland's alleged fraud on its franchisees, something that clearly is not possible given the variety of potential causes for the puppies' illnesses and the variety of reasons for the class members' purchase decisions.[3]

In summary, Plaintiffs have not shown that common issues will predominate over individual issues if this case is tried on a third-party reliance theory. The franchisee's alleged involvement in the fraud forecloses their reliance, individual issues will arise concerning the level of each franchisee's reliance, and individual issues will also arise when trying to determine whether a class member's injuries are directly related to

---

[3] The Court also notes that Plaintiffs' class definition does not even require that the class members' puppies became sick. *See* Doc. 129 at 1-2. Thus, even determining what kind of injury is claimed would require an inquiry of each class member.

Petland's fraud on the franchisees.

**IV.    Injury.**

Plaintiffs' alleged injuries include the unreimbursed premium prices they paid for their puppies and unreimbursed veterinary expenses they incurred. *See* Doc. 54 ¶¶ 143, 159, 170(1). Petland argues that proof of injury, including both the loss amount and a causal connection between the loss and the alleged scheme to defraud, must be established on a class-member-by-class-member basis. The Court agrees.

Plaintiffs fail to address the argument that, with respect to veterinary expenses, each class member must prove that his or her puppy became sick as a result of being whelped at a puppy mill. If a class member's puppy became sick for reasons other than where it was bred, the class member could show no injury attributable to the alleged scheme.

Plaintiffs assert that veterinary expenses are merely "incidental" damages (Doc. 164 at 13), but the veterinary costs sought by Moskow and Galatis are greater than the purchase price damages they seek (Doc. 129-1 at 6-7), and those costs are likely to increase given Plaintiffs' request for both past and future veterinary expenses (Doc. 129-1 at 17, 134-11 at 3). The amount of each class member's unreimbursed veterinary expenses, as well as any causal connection between those expenses and the alleged scheme to defraud, are individual issues that cannot be established through common proof.

The same is true with respect to the purchase price damages. Plaintiffs propose to establish those damages class-wide through an unidentified expert who purportedly will develop a "simple damage model" from the puppy's selling price. Doc. 164 at 13. That model consists of determining the percentage of the full value of a Petland puppy class members did not receive on account of Petland's failure to inspect breeding operations, and then multiplying this percentage value by the average price for each particular breed. *Id.* at 13-14. But this approach fails to take into account variations in price paid by

different class members at different times and in different locations. For example, Plaintiff Galatis received her puppy at a discounted price. Doc. 132-14 at 9. This approach also fails to account for class members whose puppies were in fact bred at a reputable and approved breeder. Such individuals would be members of the class because Plaintiff's definition requires only that the breeder not have been inspected by Petland. And yet purchasers who received high-quality dogs would have suffered no injury from Petland's failure to inspect the breeder or its allegedly fraudulent representations concerning the quality of the dogs sold. Thus, an inquiry into the origin and pedigree of each puppy would be needed to determine whether the class member in fact received a puppy with a poorer history than represented.

Plaintiffs note, correctly, that where common questions predominate as to liability, courts generally find the predominance requirement to be met even though individual damage issues remain. Doc. 164 at 12 (citing *Negrete*, 238 F.R.D. at 494). The task in this case, however, will not be limited to simple damages calculations. Determinations will need to be made concerning where the puppy was bred, whether the puppy satisfied the standards set forth in Petland's representations, where and how the puppy became ill, and what expenses are attributable to illnesses contracted at the breeder as opposed to elsewhere. Such issues relate to more than damages; they relate to liability – whether class members were in fact injured by the alleged fraudulent scheme. And they simply cannot be determined class-wide. Individual issues would overwhelm any trial of this proposed class action.

**IT IS ORDERED:**

1. Plaintiffs' motions for class certification and appointment of class representative and class counsel (Docs. 129, 137) are **denied**.

2. The Court will set a case management conference by separate order.

Dated this 12th day of April, 2011.

_____
David G. Campbell
United States District Judge

- 14 -